No. 26-1823

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JOHN MULLINS and THOMAS SUNDERLIN, individually and as a representative of a class of similarly situated persons, on behalf of the 401(k) Pension Plan,

*Plaintiffs-Appellees*,

v.

NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION and the INSURANCE AND FINANCIAL SERVICES COMMITTEE,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia,
No. 1:25-CV-00994-MSN-IDD (Hon. Michael S. Nachmanoff)

**REDACTED FINAL OPENING BRIEF FOR APPELLANTS**

Christina L. Hennecken
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000

Nehama Hanoch
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Jordan Bock
*Counsel of Record*
James O. Fleckner
Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*jbock@goodwinlaw.com*

*Counsel for Appellants National Rural Electric Cooperative Association and the Insurance and Financial Services Committee*

September 10, 2026

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rule 26.1, Defendants-Appellants National Rural Electric Cooperative Association (NRECA) and the Insurance and Financial Services Committee state that:

- The Insurance and Financial Services Committee is a committee of NRECA.
- NRECA does not have a parent corporation, and no publicly held corporation owns more than 10% of its stock.
- NRECA is a trade association that has no publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding.

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION...................................................................4

STATEMENT OF THE ISSUES........................................................................5

STATEMENT OF THE CASE...........................................................................5

I. NRECA, the Plan, and the Cooperatives .....................................................5

A. Administrative Services ..........................................................................7

B. Administrative Costs. ............................................................................10

C. The Fiduciary Process. ..........................................................................12

II. The Named Plaintiffs. ................................................................................13

III. Procedural History ....................................................................................16

A. Plaintiffs file a putative ERISA class-action complaint, claiming excessive fees for administrative services..........................................16

B. The district court certifies the class under Rule 23(b)(1)...................18

C. After *Trauernicht*, the district court vacates its decision and recertifies the class under Rule 23(b)(3). ..........................................20

SUMMARY OF THE ARGUMENT ................................................................23

STANDARD OF REVIEW .............................................................................26

ARGUMENT ..................................................................................................26

I. The district court did not rigorously analyze the predominance or commonality prerequisites, which were not satisfied here...........................28

A. The district court's failure to conduct a rigorous analysis of predominance and commonality is a *per se* abuse of discretion.........29

B. Plaintiffs did not prove that the class satisfies the predominance and commonality prerequisites.........................................................35

II. The district court abused its discretion by ignoring fundamental intraclass conflicts and deeming the typicality and adequacy criteria satisfied with no analysis. ............................................................................49

III. The named Plaintiffs have not established Article III standing. ...................57

CONCLUSION ...............................................................................................60

CERTIFICATE OF COMPLIANCE...............................................................61

CERTIFICATE OF SERVICE .........................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alig v. Rocket Mortg., LLC*,
126 F.4th 965 (4th Cir. 2025) ....................................................................43

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................42

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................................27, 29, 30, 49

*Anderson v. Lab'y Corp. of Am. Holdings*,
2023 WL 1970953 (M.D.N.C. Feb. 13, 2023) ..............................................42

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................................................................... 15-16

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ....................................................................57

*Stafford v. Bojangles' Rests., Inc.*,
123 F.4th 671 (4th Cir. 2024) ....................................................................29, 33

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..............................................46, 49, 50, 52, 56

*Chavez v. Plan Benefit Servs., Inc.*,
957 F.3d 542 (5th Cir. 2020) ....................................................................30, 34

*Conkright v. Frommert*,
559 U.S. 506 (2010)....................................................................................7

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ....................................................................49

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) ....................................................................57

*Ealy v. Pinkerton Gov't Servs., Inc.*,
514 F. App'x 299 (4th Cir. 2013) ....................30, 56

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ....................28, 29, 46, 48

*Fernandez v. RentGrow, Inc.*,
116 F.4th 288 (4th Cir. 2024) ....................26, 59

*Freeman v. Progressive Direct Ins. Co.*,
149 F.4th 461 (4th Cir. 2025) ....................35, 57, 59

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ....................33

*Green-Cooper v. Brinker Int'l, Inc.*,
73 F.4th 883 (11th Cir. 2023) ....................45

*Guenther v. Lockheed Martin Corp.*,
972 F.3d 1043 (9th Cir. 2020) ....................48

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)....................6

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)....................11

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
589 U.S. 178 (2020).................... 46-47

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025)....................38

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) .................... 41-42

*Laudato v. EQT Corp.*,
23 F.4th 256 (3d Cir. 2022) ....................16

*Mr. Dee's v. Inmar*,
127 F.4th 925 (4th Cir. 2025) ....................27, 38, 45

*Overby v. Anheuser-Busch, LLC*,
178 F.4th 175 (4th Cir. 2026) ....................................................26, 28, 29 33, 34

*In re Pre-Filled Propane Tank Antitrust Litig.*,
2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ..................................................42

*Sharp Farms v. Speaks*,
917 F.3d 276 (4th Cir. 2019) ...............................................27, 49-50, 52, 55-56

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013) .........................................................................15

*State of Rhode Island Office of the General Treasurer v. Boeing Co.*,
__ F.4th __, 2026 WL 2083048 (4th Cir. July 20, 2026) ............................ 26-27

*In re Target Corp. Customer Data Sec. Breach Litig.*,
847 F.3d 608 (8th Cir. 2017) .................................................................30, 31

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)...........................................................................................58

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) ..........................................................................46

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................................43, 51

*Trauernicht v. Genworth Financial, Inc.*,
169 F.4th 459 (4th Cir. 2026)…......... 2, 6, 20-21, 23, 27, 29, 31-33, 35-38, 39

*Trauernicht v. Genworth Financial, Inc.*,
2024 WL 3835067 (E.D. Va. Aug. 15, 2024) ..................................................19

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)...........................................................................................44

*United States v. Sanchez-Gomez*,
584 U.S. 381 (2018)...........................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).........................................................1, 28, 29, 33, 35, 49

*In re Zetia (Ezetimibe) Antitrust Litig.*,
7 F.4th 227 (4th Cir. 2021) .................................................. 1, 28, 29-30

**Statutes**

29 U.S.C. § 1002(34) ........................................................................5

29 U.S.C. § 1104 ...........................................................................47

29 U.S.C. § 1106 ...........................................................................47

29 U.S.C. § 1113(2) .................................................................24, 45, 46

**Regulation**

29 C.F.R. § 2550.408c-2(b)(3)........................................................10

**Rules**

Fed. R. Civ. P. 23(a)(3).....................................................................49

Fed. R. Civ. P. 23(a)(4).....................................................................49

Fed. R. Civ. P. 23(b)(3).....................................................................27

**Other Authority**

1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:30 (22nd
ed.)...........................................................................................52, 56

# INTRODUCTION

Because a class action breaks the norm of individual litigation, courts must conduct a "rigorous analysis"—or "full-throated analysis," as this Court has put it—before finding that Rule 23's prerequisites have been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011); *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 239 (4th Cir. 2021). The decision below does the opposite, glossing over many of the Rule's prerequisites in total silence. The court offered *zero analysis*—not even a word—of predominance under Rule 23(b)(3) or typicality and adequacy under Rules 23(a)(3) and (4). And it disposed of Defendants' challenges to commonality under Rule 23(a)(2) and Article III standing with oral remarks that were both cursory and incorrect.

That procedural lapse is magnified by the substantive defects of the class, which fails one Rule 23 prerequisite after another. The district court certified a class of nearly 100,000 participants of an ERISA plan who are (or were) employed by over 900 different rural electric cooperatives, or "co-ops." The plan is a defined-contribution, multiple-employer plan sponsored by NRECA—a non-profit trade association for such co-ops. Plaintiffs claim Defendants breached their fiduciary duties under ERISA because the fees for NRECA's plan administrative and recordkeeping services, offered *at cost* and approved by independent fiduciaries, were allegedly "excessive."

This Court's recent decision in *Trauernicht v. Genworth Financial, Inc.*, 169 F.4th 459 (4th Cir. 2026), is directly on point, holding that ERISA claims in a defined-contribution plan context are *individualized* and so courts must "rigorous[ly]" analyze "whether class members suffered different injuries resulting from their different circumstances." *Id.* at 474. Just as in *Trauernicht*, Plaintiffs' claims are individualized: NRECA's administrative fees were all incurred by individual plan participants in their individual plan accounts and varied from participant to participant depending on the investments they selected, when they invested, and the amounts they chose to invest.

Pre-*Trauernicht*, Plaintiffs moved for certification only under Rule 23(b)(1), and the district court summarily certified that class. After *Trauernicht*, the district court recognized that its "prior decision in certifying under (b)(1) is not correct," JA60-61, so it vacated that order. Yet the court promptly recertified a sprawling damages class under Rule 23(b)(3) from the bench. The court never explained how the putative class members suffered *the same injury* through varying fees incurred by their individual plan accounts, as *Trauernicht* requires. Indeed, the record showed that approximately half the class suffered *no* injury as compared to fees paid under the supposed comparator plans proffered by Plaintiffs. The court circumvented those questions by calling them merely "an issue of the allocation of damages," JA61, which contradicts *Trauernicht*'s commonality holding. In any

event, the predominance criterion is even more demanding than the commonality requirement, and Plaintiffs did not show that common questions predominate. Nor could they: to establish any injury traceable to the alleged ERISA violations, each of the nearly 100,000 class members would have to present *individualized* evidence that what *they* paid from their individual Plan account exceeded what they would have paid under a different fee arrangement for comparable services. Common questions simply do not predominate.

Equally problematic, the class definition sweeps in *all* participants and beneficiaries who paid *any* fees—not just fees alleged to be "excessive"—even though NRECA's asset-based fee structure and wide variety of services offered affected different class members differently. Participants with very large account balances (who paid a large amount in fees) are lumped together with those with very small account balances (like the named Plaintiffs, who paid very little in fees)—despite the fact that the two groups have seriously conflicting interests about how fees should be assessed. And participants working for very small co-ops with limited in-house benefits staff who depend on NRECA's high-touch services (*e.g.* full-service plan administration, payroll integration, and participant education) are lumped together with participants (like the named Plaintiffs) working for large co-ops who use fewer of those services—again despite the fact that the two groups have seriously conflicting interests about whether the services provided at cost should be

reduced in order to reduce the cost of services. These fissures within the class reflect fundamental conflicts of interest going to the heart of the litigation, *i.e.*, what is a prudent fee structure, what level of services is appropriate for the plan (understanding that the services are provided at cost and therefore any reduction in fees will necessarily come with a reduction in services), and who (if anyone) was injured. In these circumstances, the typicality and adequacy prerequisites are not met and the class cannot be certified.

Finally, the district court erred in another critical respect: the court found that the named Plaintiffs have Article III standing without a showing of any *personal* concrete harm, because it erroneously believed that Article III standing was satisfied simply by bringing a claim "under 502(a)(2) of ERISA," just as Plaintiffs had argued. JA31. That error of law was likewise an abuse of discretion.

The Court should reverse the certification order below and remand with instructions to deny the motion for class certification.

## STATEMENT OF JURISDICTION

The district court granted class-action certification on May 1, 2026. JA71. On May 15, 2026, Defendants-Appellants petitioned for permission to appeal under Federal Rule of Civil Procedure 23(f), which this Court granted. *Mullins v. NRECA*, No. 26-165 (4th Cir.), Dkt. 21. This Court has jurisdiction under Rule 23(f) and 28 U.S.C. § 1292(e).

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in failing to conduct a rigorous analysis of commonality and predominance and finding that those prerequisites to class certification under Rule 23(b)(3) are satisfied even though the putative class members' individual circumstances differed significantly and all did not suffer the same injury (or, in many instances, any injury at all).

2. Whether the district court abused its discretion in failing to conduct any analysis of typicality and adequacy and in finding that those prerequisites to class certification under Rule 23(a)(3) and (a)(4) are satisfied despite fundamental intraclass conflicts between different groups of putative class members.

3. Whether the district court erroneously concluded that Plaintiffs "adequately alleged Article III standing under [§] 502(a)(2) of ERISA," without identifying any concrete and individualized injury-in-fact the named Plaintiffs personally experienced in their individual plan accounts.

## STATEMENT OF THE CASE

### I. NRECA, the Plan, and the Cooperatives

NRECA is a national, non-profit trade association serving over 900 not-for-profit rural electric cooperatives (co-ops) or systems. JA1007. It offers member co-ops a multitude of services, including the 401(k) Plan at issue here.

The Plan is a "defined contribution plan," also called an "individual account plan." 29 U.S.C. § 1002(34); *see* JA1001-1003, JA1007-1008. An individual-

account plan, such as a 401(k) plan, "promises retirement income based on the value of each individual participant's account, and the amount of that income is a function of the participant's and employer's contributions to the account, as well as its investment performance." *Trauernicht*, 169 F.4th at 463. "A defined benefit plan, on the other hand, consists of a general pool of assets rather than individual dedicated accounts." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). A defined-benefit plan "holds and invests contributed funds from which it pays participants and beneficiaries a defined and fixed retirement income, typically based on their years of service and compensation." *Trauernicht*, 169 F.4th at 463.

Unlike a typical single-employer 401(k) plan like the kind in *Trauernicht*, the NRECA Plan is a highly customizable multiple employer plan (MEP). JA1007-1008. A MEP is a retirement plan adopted by multiple unrelated employers and administered by a plan sponsor—here, NRECA. JA1003-1004. The NRECA MEP serves employees and former employees of about 900 co-ops and more than 1500 co-op subgroups that elect to enroll in the Plan. JA1007-1008. By pooling together resources, a MEP can reduce costs for single employers by spreading administrative and recordkeeping expenses and leveraging the group's combined purchasing power. JA1003-1004. And unlike a single-employer plan, where the employer is responsible for plan administration, fiduciary oversight, and regulatory compliance, a MEP consolidates many of these responsibilities. JA1003-1004. This arrangement

can be particularly significant for small employers (like rural electric co-ops) that have limited administrative resources, a lack of internal compliance expertise, and higher per-participant costs on their own. JA1004-1005. Without the benefits provided by a MEP, offering a retirement plan may be cost-prohibitive or logistically impossible for small employers. *See Conkright v. Frommert*, 559 U.S. 506, 516 (2010) ("Congress did not require employers to establish benefit plans in the first place ….").

### A. Administrative Services

NRECA makes available a comprehensive suite of administrative services to the Plan and participating co-ops and subgroups, including a host of human resource services, such as benefits administration, employee communications, and payroll support. JA727. Among other things, NRECA offers co-ops the following plan services:

- [redacted]
- [redacted]

- [redacted]

[redacted]

JA727. NRECA also is responsible for engaging and managing third-party providers that offer further services, including external audit and legal services and information technology services. JA729-732.

NRECA offers communication and education services directly to Plan participants as well. These services include (among others): conducting seminars on investment topics, preparing written retirement plans, running private one-on-one meetings with participants, and responding to inquiries through a call center. JA729-732. These features are accessible to participants through a website portal, which also provides participants access to: (i) their personal account information; (ii) contact information for NRECA's dedicated team of investment and retirement planners; and (iii) links to NRECA's interactive retirement planning tools and advice, planning calculators, and financial planning articles. JA263, JA282-287, JA727.

The services that any particular co-op or participant enjoys depend on the choices made by each employer and participant. While NRECA administers the master plan, each participating co-op or subgroup that elects to join the MEP does so by signing an adoption agreement. JA1025-1027. The adoption agreement provides them the flexibility to select the plan-design features of their choice. JA1025-1027. For instance, each co-op or subgroup selects its own plan terms, such as eligibility requirements and contribution formulas, and can also decide whether to select additional plan features and services, including Roth elective contributions, participant loans, and in-service withdrawals. JA1025-1027.

The NRECA Plan is a particularly large and complicated MEP given the vast diversity of participating employers. From 2020 to 2024, the number of participating cooperatives ranged from 925 to 950; the number of subgroups exceeded 1,500; the number of active participants ranged from 71,742 to 79,674; and total assets increased from $13.3 billion to $16.7 billion. JA1007-1008. Co-op participant size ranged from a single participating employee to well over [redacted] employees per co-op, though many participating co-ops were small—nearly [redacted] had fewer than [redacted] participating employees. JA1037. Each one of the subgroups has unique plan terms selected by the co-op, so each one has to be administered by NRECA based on a different set of plan rules. JA1040-1045. Providing this suite of customized services to rural co-ops and their participants is more complex, and costlier, than

administering a single-employer plan, particularly with respect to services that must be independently performed for each co-op or subgroup. JA1013-1016, JA1019.

Naturally, different co-ops and subgroups have different needs and use different services. Smaller participating co-ops are more likely to rely on NRECA for full-service administration, payroll integration, and participant education, because, unlike the larger co-ops, they often lack the in-house resources to provide these functions. JA1037-1038. Likewise, some co-ops offer more complex features, such as participant loans, that require NRECA to perform additional administrative tasks for each loan, including processing applications, distributing loan proceeds, and processing repayments; other co-ops elect not to offer those features. JA1040-1047.

**B. Administrative Costs.**

NRECA offers administrative services to the Plan *at cost*, limited to receiving payment for "direct expense[s]," 29 C.F.R. § 2550.408c-2(b)(3). *See* JA722, JA733. NRECA bills the Plan for its expenses pursuant to an Administrative Services Agreement (ASA). JA733. The ASA sets forth stringent expense criteria—[redacted] JA733-734. A separate independent fiduciary approves those costs. JA1011-1012.

Other than a $10 monthly fee to use a self-directed brokerage account (SDBA), the Plan did not impose additional fees for optional services. Thus, there was no separate fee for loan services used by participants, or for processing QDROs to allow former spouses to obtain an interest in a participant's account. JA1029-1030.

The amounts billed to the Plan are deducted from Plan participants' individual plan accounts through the "expense ratios" of the investment options in which participants choose to invest, JA1029-1030—*i.e.*, fees "calculated as a percentage of the assets the plan participant chooses to invest in the fund," *Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022). During the putative class period, those administrative fee expense ratios ranged from 0.17% to 0.25%, depending on the investment option each participant selected and the time of investment. JA613, JA616. For example, in 2020, a participant who invested in the Value Stock Fund would have paid 0.24% of the total assets she invested in that fund toward NRECA's administrative expenses, while a participant invested in the 2060 Target Date Fund would have paid 0.22%. JA615. In 2021, the administrative fee expense ratios for those funds decreased to 0.19% and 0.18%, respectively. JA618, JA1210.

Because NRECA's administrative fees are not charged as a flat, per-participant annual fee, the impact of NRECA's administrative expenses on any participant's account varied considerably depending on which investment options

the participant selected, the participant's account balance in each selected investment, and the investment's administrative fee expense ratio—factors that changed over time. JA1052-1053, JA1129; *see* JA584-585.

Given this variation, annual fees for NRECA's administrative services ranged from $0 for accounts of participants at the 1st percentile to approximately $3,000 at the 99th percentile from 2020-2024. JA1052-1053, JA1129. Participants in the 25th percentile paid approximately $30 each year. JA1052-1053, JA1129. The mean annual fee ranged from approximately $336-$381 between 2020 and 2024, and the median fee ranged from approximately $119-$140. JA1052-1053, JA1129.

### C. The Fiduciary Process.

The Insurance and Financial Services Committee ("Committee") serves as the named fiduciary for the Plan and is responsible for its administration. JA121. During the class period, the Committee monitored Plan administrative expenses by, among other things, considering extensive quarterly presentations by the Plan administrator and NRECA finance personnel regarding Plan administration and expenses, and conducting regular reviews of Plan service providers, including through benchmarking and requests for proposal. *E.g.*, JA817, JA875.

In addition, multiple independent fiduciaries and auditors review and approve the prudence of the fees paid to NRECA for its services and the allocation of fees paid by the Plan. For example, Newport Trust Company ("Newport") served as an

independent fiduciary for the Plan during the putative class period through 2025. JA1009-1012. With assistance from its own independent consultant, Callan LLC, Newport independently evaluated the Plan's administrative services and costs and the prudence of retaining NRECA as a Plan service provider. JA892, JA901, JA907. In 2021 and 2023, Newport reported to the Committee that, "[g]iven the sound structure of the plan investment menu, quality of customized services offered to plan participants, and reasonableness of the fees, Newport Trust has determined that retaining NRECA to continue providing services to the 401(k) Pension Plan is prudent." JA825, JA882.

Newport Trust and the Plan also retained another consultant, Calibre CPA Group, to develop and approve an expense methodology for allocating administrative and recordkeeping costs to the Plan and to assist Newport in monitoring NRECA's compliance with the approved methodology. JA1011-1012.

## II. The Named Plaintiffs.

Plaintiff John Mullins has participated in the Plan since 2019. JA277-278, JA299. Mr. Mullins is a security application analyst employed by one of the five largest employers participating in the Plan (with more than 800 Plan participants), the Associated Electric Cooperative Inc. (AEC) in Springfield, Missouri. JA269, JA296. As of December 31, 2024, his Plan account balance was $100,124.99, well below the Plan's $209,821 average account balance. JA302, JA1034-1035, JA1134

Mr. Sunderlin participated in the Plan between 2015 and June 19, 2025. JA331-332, JA308-309. He was previously employed by South Central Power Company, which is also one of the larger participating co-ops in the Plan; it ranks within the top 40 out of the approximately 900 co-ops in the Plan, with more than 290 Plan participants. JA310, JA320. And, like Mullins, Sunderlin's account balance was below the Plan average, at $75,478.18 as of December 31, 2024. JA1035. Between 2020 and 2024, Sunderlin maintained an outstanding loan against his Plan account and took out an additional loan in 2023. JA344, JA347, JA350, JA352, JA355, JA317.

Both named Plaintiffs were charged relatively little in administrative fees throughout the class period because their account balances were well below average: while the average Plan participant's account balance ranged from approximately $168,000 to $210,000 during the class period, Mullins's balance ranged from approximately $30,000 to $100,000 and Sunderlin's ranged from approximately $30,000 to $76,000. JA1088-1089. Due to his low balance, Mullins paid about $57 in administrative fees in 2020, $87 in 2021, $98 in 2022, $134 in 2023, and $180 in 2024. JA1088-1089. Sunderlin paid even less: about $52 in 2020, $67 in 2021, $81 in 2022, $65 in 2023, and $103 in 2024. JA1088-1089.

Both Mullins and Sunderlin are members of a settlement class arising from a similar ERISA class action lawsuit filed in 2019 challenging NRECA's

administrative fees. *See Intravaia v. NRECA*, No. 19-cv-973 (E.D. Va.); JA100. Both received monetary relief from the settlement in 2021 and benefited from the prospective relief in that case, which included the retention of an independent fiduciary to conduct a comprehensive independent consultant study every three years. JA100, JA641.

Defendants made the business decision in 2020 to settle those claims, as well as an earlier investigation by the Department of Labor in 2012 focused on distinct allegations not at issue here. *See* JA236. But contrary to comments repeatedly made by Plaintiffs,[1] and unfortunately by the district court as well,[2] those business decisions hardly suggest those claims had any merit then, nor that Plaintiffs' claims today have any merit now. Indeed, following those settlement agreements, NRECA has only *bolstered* its fiduciary process and independent fiduciary involvement, as discussed above, pp. 12-13, *supra*. And as courts have recognized, the asymmetric nature of discovery in putative ERISA class actions, as well as the large amount of damages commonly claimed in ERISA class actions, creates enormous settlement pressure, especially for non-profit plan sponsors like NRECA. *See PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013); *cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011)

---

[1] JA41, JA47.
[2] JA31.

("Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims."). That pressure is only exacerbated when district courts "attempt to nudge [the parties] toward settlement" immediately upon certifying a class, *Laudato v. EQT Corp.*, 23 F.4th 256, 261 (3d Cir. 2022), as the district court did here after *each* class-certification decision, JA31, JA63. Indeed, that is one of the reasons why interlocutory review of class-certification decisions is so important. *Laudato*, 23 F.4th at 261.

## III. Procedural History

### A. Plaintiffs file a putative ERISA class-action complaint, claiming excessive fees for administrative services.

In June 2025, Plaintiffs sued under ERISA § 502(a)(2) and § 502(a)(3), asserting claims for violations of ERISA's fiduciary duties (ERISA § 404(a)) and ERISA's prohibited-transaction provisions (ERISA § 406). JA91-95. Their complaint alleged that NRECA's administrative services fees were "excessive," JA75-76, JA93-94, even though the Plan's *independent* fiduciary (Newport Trust) consistently approved of the arrangement (including NRECA's fees) given the high quality of services provided by NRECA. JA824-825, JA881-882.

In support of their excessive-fees theory, Plaintiffs' expert (John Scheinberg) identified what he called a "reasonable set" of 10 comparators establishing "market standards for comparable services provided to similarly situated plans." JA792-793. Many of those plans assessed fees on an asset basis, as the Plan did, and some had

tiered pricing where participants whose employers had small balances paid higher rates, up to 0.70% of their assets—compared to NRECA's administrative fees of between 0.17% and 0.24%. *See* JA593, JA1069-1070. Under that metric, nearly every Plan participant paid a lower percentage fee than participants in Scheinberg's plans. *See* JA1059-1060.

Rather than look at how fees were *actually* assessed, however, Scheinberg instead used a simplistic and inaccurate mathematical formula to craft his own "per-participant fees" for the comparator plans: he simply divided the direct recordkeeping and administrative fees reported in the comparator plans' regulatory filing (the "Form 5500") by the number of participants reported in the Form 5500. JA795-796, JA1055-1057. That calculation understates the fees of those comparators, though, because it fails to include the amounts of indirect compensation received by those other service providers (which is common among other plans, but not used by NRECA, and is not reported on Forms 5500). JA1055-1056, JA1058, JA1060, JA1065-1066. Based on that calculation, Scheinberg found that the average participant in his comparator plans paid $69 to $310 in direct fees from 2020 and 2024:

| COMPARATORS | Schedule C Costs per Partic. w/ Balance less Code 28 (Investment Management) | | | | |
|---|---|---|---|---|---|
| Plan | 2020 | 2021 | 2022 | 2023 | 2024 |
| CREDIT UNION RETIREMENT PLAN ASSOCIATION 401(K) PLAN | $ 239 | $ 310 | $ 134 | $ 145 | $ 160 |
| ENGAGE PEO RETIREMENT SAVINGS PLAN | $ 113 | $ 120 | $ 103 | $ 100 | $ 116 |
| EXTENSIS GROUP RETIREMENT SAVINGS PLAN | $ 215 | $ 249 | $ 81 | $ 87 | $ 141 |
| G & A PARTNERS MULTIPLE EMPLOYER 401(K) PLAN | $ 222 | $ 300 | $ 260 | $ 161 | $ 176 |
| OASIS RETIREMENT SAVINGS PLAN | $ 111 | $ 114 | $ 105 | $ 113 | $ 121 |
| PACIFIC DENTAL SERVICES, LLC 401(K) PLAN | $ 107 | $ 99 | $ 69 | $ 73 | $ 85 |
| QUESTCO COMPANIES RETIREMENT PLAN | $ 93 | $ 155 | $ 163 | $ 149 | $ 193 |
| RETIREMENT PLAN FOR MICHIGAN CREDIT UNION EMPLOYEES 401(K) SAVINGS PLAN | $ 156 | $ 157 | $ 135 | $ 137 | $ 131 |
| SAVINGS PLAN FOR EMPLOYEES OF NCTA AND ITS MEMBERS | $ 143 | $ 136 | $ 124 | $ 140 | $ 148 |
| VENSURE EMPLOYER SERVICES, INC. 401(K) PROFIT SHARING PLAN | $ 100 | $ 121 | $ 230 | $ 129 | $ 146 |
| | | | | | |
| **MEDIAN** | **$ 128** | **$ 145** | **$ 129** | **$ 133** | **$ 143** |
| **MEAN** | **$ 150** | **$ 176** | **$ 140** | **$ 123** | **$ 142** |

JA799. Scheinberg then compared all the comparators' averages to reach a "median per-participant cost among the comparator set" of "approximately $128 to $145"—in other words, a median-of-averages. JA799.

Because the mean NRECA direct per-participant annual administrative fees exceeded the comparator direct per-participant median-of-averages, Plaintiffs relied upon Scheinberg's "per-participant" framework to argue that NRECA's fees were unreasonable, seeking over $100 million in damages. JA771.

Each year from 2020 to 2024, approximately half of Plan participants paid lower fees than the Scheinberg comparator average fee—Plaintiffs' only formulation of injury. JA1058. And when calculated as a percentage of assets (which is how Plan fees are actually assessed), more than 99% of participants paid a *lower* percentage of their account assets than the Scheinberg comparators. JA1059-1060.

### B. The district court certifies the class under Rule 23(b)(1).

In January 2026, Plaintiffs moved for class certification *exclusively* under Rule 23(b)(1). They relied primarily on the district court's now-reversed decision

in *Trauernicht v. Genworth Financial, Inc.*, 2024 WL 3835067 (E.D. Va. Aug. 15, 2024), citing it 37 times in their class-certification briefing. Just like the district court in *Trauernicht*, Plaintiffs repeatedly asserted that "ERISA fiduciary breach actions inherently" and "necessarily" satisfy Rule 23's commonality and typicality requirements, and are properly certified as a mandatory class under Rule 23(b)(1). *E.g.*, JA777, JA779, JA783, JA785. Similarly, at the certification hearing, Plaintiffs told the district court that the commonality requirement was satisfied because "[a]n ERISA § 502 derivative claim *inherently presents issues that are common to the class* because liability arises out of the defendant's conduct with respect to the plan." JA24 (emphasis added).

In opposing that motion, Defendants argued that the named Plaintiffs lack Article III standing because the unrebutted evidence shows that they personally paid less in administrative fees than under their only evidence of injury (the Scheinberg comparators); that the proposed class did not suffer a common injury as necessary to establish commonality; that fundamental intraclass conflicts defeat typicality and adequacy; and that Plaintiffs' claims are individualized monetary claims that do not belong in a Rule 23(b)(1) class. JA950.

The court nonetheless certified the class at a March 2026 hearing. Without asking a single question or providing *any* reasoning, the court said that "the plaintiffs have adequately alleged Article III standing under 502(a)(2) of ERISA" and

summarily recited "that under 23(a), ascertainability, numerosity, commonality, typicality, and adequacy of counsel have all been sufficiently established, as ha[ve] 23(b) requirements." JA31. That day, the court issued a written order that again offered *no* analysis: "for the reasons stated in open court" (there were none), "the Court concludes that Plaintiff's Proposed Class meets the Federal Rule of Civil Procedure 23(a) requirements of numerosity, commonality, typicality, and adequacy" and "satisfies the criteria of Federal Rule of Civil Procedure 23(b)(1)(A) and 23(b)(1)(B)." JA34.

### C. After *Trauernicht*, the district court vacates its decision and recertifies the class under Rule 23(b)(3).

Four days later, this Court explained in *Trauernicht* that "the scope of relief obtained by the plan varies considerably depending on whether the plan is a defined contribution plan or a defined benefit plan." 169 F.4th at 467. "In the context of a defined benefit plan, where the plan assets are undifferentiated …, a plan participant injured by a fiduciary's breach must, by necessity, seek losses on behalf of the plan *as a whole*…." *Id.* at 467-468. But "in the context of a defined contribution plan, a participant's damages claim under § 502(a)(2)"—*i.e.*, the claim asserted by Plaintiffs here—"is an 'individualized monetary claim'" and, therefore, "a mandatory class action under Rule 23(b)(1) is inappropriate." *Id.* at 470-471.

*Trauernicht* also held that this distinction affects the commonality analysis. The Court rejected the conclusion that, in the defined-contribution context, there is

"'inherent' commonality of [ERISA] § 502(a)(2) claims." *Id.* at 474. Rather, the Court explained, "given that these are individualized claims, the district court needed to conduct a rigorous analysis to determine whether members of the class suffered the same injury, as required for finding commonality under Rule 23(a)(2)." *Id.* at 472. The Court deemed it an abuse of discretion not to perform "a rigorous analysis of commonality" that "address[es] whether class members suffered different injuries resulting from their different circumstances arising in the context of a defined contribution plan." *Id.* at 474.

In *Trauernicht*'s wake, the district court ordered supplemental briefing and vacated its class-certification order. JA543-544. Plaintiffs' opening supplemental brief primarily argued that certification under Rule 23(b)(1) was still appropriate notwithstanding *Trauernicht*. *See* JA550-564. In the alternative, they argued that the class could be certified under Rule 23(b)(3). JA564-570. They posited that *Trauernicht*'s commonality holding was irrelevant because "Plaintiffs allege a single Plan-level injury" and "[u]nder ERISA § 502(a)(2), any recovery for that injury runs to the Plan, not to individual participants." JA1350-1351. Plaintiffs did not submit any new evidence with their opening brief showing that Rule 23(b)(3)'s predominance requirement was satisfied. Instead, they argued that certification of ERISA classes under Rule 23(b)(3) is "routine[]," summarily asserted (without any evidence or explanation) that their claims could be resolved with common evidence,

and rested on the fact that *other* ERISA classes actions had been certified by other courts. JA565-568.

Defendants' supplemental brief in opposition argued that *Trauernicht* "completely forecloses class certification here under Rule 23(b)(3) just as it does under Rule 23(b)(1)" because the class members did not suffer the same injury, as necessary for commonality. JA580-581. Defendants further argued that Plaintiffs had not established that common questions predominate under Rule 23(b)(3), particularly given the individualized issues of injury and the statute-of-limitations defense that turns on each class member's actual knowledge. JA599-603. Defendants also reiterated their challenge to the named Plaintiffs' Article III standing, and to Plaintiffs' insufficient showings on typicality and adequacy. JA604-605.

The district court held a short hearing on May 1, 2026, which the court emphasized was solely devoted to "new argument[s] in light of *Trauernicht*" and was not an opportunity "for reconsideration" of "decision[s] already made" in the first certification order. JA59. The court recognized that its previous Rule 23(b)(1) certification was "not correct" "in light of *Trauernicht*." JA60-61. Yet it proceeded to recertify the same class under Rule 23(b)(3). JA62. The court said *Trauernicht* did not "change[] [its] prior conclusion" on commonality, and that Defendants' evidence that putative class members did not all suffer the same injury was merely

"an issue of the allocation of damages," irrelevant to the propriety of class certification. JA61. Strikingly, the district court offered *no* analysis or findings regarding the predominance requirement of Rule 23(b)(3)—the court did not even utter the word "predominance" at the hearing—and likewise said nothing regarding typicality, adequacy, or Article III standing.

Following the hearing, the district court again issued a perfunctory written order granting class certification "for the reasons stated in open court," JA71, without further explanation.

## SUMMARY OF THE ARGUMENT

**I.** District courts must undertake a "rigorous analysis" of commonality, including "whether class members suffered different injuries resulting from their different circumstances arising in the context of a defined contribution plan." *Trauernicht*, 169 F.4th at 474. And the inquiry under the predominance prong is far more demanding still. Here, the district court summarily certified a sprawling 100,000-member class without anything approaching a rigorous analysis. And the facts in the record foreclose a finding of commonality, much less predominance, under this Court's precedents.

**A.** The district court's unreasoned decision falls far short of the "rigorous analysis" Rule 23 demands. When Defendants raised the lack of common injury to explain why Plaintiffs failed to satisfy Rule 23(a)'s commonality requirement,

specifically noting this Court's analysis of the issue in *Trauernicht*, the district court erroneously dismissed that inquiry as irrelevant to class certification by recasting it as "an issue of the allocation of damages." JA61. Even more inexplicably, the court proceeded to certify the class under Rule 23(b)(3) without saying *anything* about predominance, a requirement that is far more demanding than commonality. The end result: a virtually reasonless class-certification decision that frustrates any meaningful appellate review. That alone is an abuse of discretion.

**B.** Had the district court given the record and Rule 23 a closer look, it would have seen that predominance and commonality are not remotely satisfied here. As in *Trauernicht*, this is a defined-contribution Plan in which each participant's injury (if any) turns on her individual investment selections, the timing of those selections, and the amounts she invested. By Plaintiffs' own metric of injury—the mean per-participant direct fee under 10 supposed comparator plans—roughly half the class here suffered *no injury*, because they paid the same or less than average participants in those proffered comparator plans. The entire class certainly did not suffer *the same injury*. And the evidence needed to prove each class member's injury is entirely individualized. Moreover, Defendants' affirmative statute-of-limitations defense turns on each class member's "actual knowledge," 29 U.S.C. § 1113(2), which likewise can only be litigated based on individualized

evidence. But the district court said nothing about this issue either. These circumstances render this case unsuitable for class certification under Rule 23(b)(3).

**II.** The district court also failed to perform any analysis of the typicality and adequacy prerequisites whatsoever, even though Defendants highlighted several fundamental intraclass conflicts striking at the core issues in this litigation. The named Plaintiffs have unusually low account balances, so they paid minimal fees—*i.e.*, they benefited from NRECA's asset-based fee structure. That makes their interests and theory of the case fundamentally antagonistic to those of class members with high account balances, who paid a much higher proportion of the Plan's administrative fees under that that fee structure. Likewise, the named Plaintiffs belong to some of the Plan's largest co-ops, which do not use many of the comprehensive suite of administrative services offered by NRECA. While the named Plaintiffs would prefer lower costs (which would require jettisoning services, since NRECA provides all administrative services *at cost*), reducing services would harm the many smaller co-ops that heavily depend on NRECA to provide those administrative services. These conflicts preclude class certification, yet the district court ignored them entirely. That, too, was an abuse of discretion.

**III.** The district court's Article III standing analysis, which relied on the statutory cause of action to supply constitutional standing for the named Plaintiffs, is also demonstrably incorrect under Supreme Court precedent. The court did not

identify any other basis for the named Plaintiffs' standing. Nor could it, since the fees paid by the named Plaintiffs were well within or below the average direct per-participant fees paid by the purported comparator plans Plaintiffs' expert used as benchmarks. A class cannot be certified where the named Plaintiffs have no standing.

## STANDARD OF REVIEW

This Court reviews "the district court's class-certification decision for abuse of discretion." *Overby v. Anheuser-Busch, LLC*, 178 F.4th 175, 180 (4th Cir. 2026). The Court reviews de novo "[w]hether a plaintiff has Article III standing," even in the context of a class-action certification decision. *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024).

## ARGUMENT

"A class action represents an exceptional form of litigation" that "departs from the 'usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Overby*, 178 F.4th at 181 (quoting *United States v. Sanchez-Gomez*, 584 U.S. 381, 387 (2018)). "[P]roceeding as a class implicates due process concerns" both for absent class members whose claims are resolved without their involvement, and also for class-action defendants who "can be sued by a class of hundreds or thousands of people who are relieved of their normal responsibility to file and prosecute their own case." *State of Rhode Island Office of the General*

*Treasurer v. Boeing Co.*, __ F.4th __, 2026 WL 2083048, at *2 (4th Cir. July 20, 2026) (citation omitted).

As this Court has explained, "Rule 23 seeks to balance" the "seemingly endless tug of pros and cons" of adjudicating hundreds or thousands of claims "at a single time." *Boeing*, 2026 WL 2083048, at *2 (quotation marks omitted). Every class must satisfy four "basic prerequisites" under Rule 23(a): "numerosity of parties, common questions of law or fact, typicality of claims or defenses of the representative parties, and adequacy of representation." *Mr. Dee's v. Inmar*, 127 F.4th 925, 930 (4th Cir. 2025) (citation omitted). Where, as here, the class was certified under Rule 23(b)(3), the Rule further "requires a finding that common questions 'predominate over' any individualized questions, and that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

The Rule 23 requirements work together to ensure that if a class is not sufficiently cohesive, it will not be certified—*e.g.*, if class members "suffered different injuries resulting from their different circumstances arising in the context of a defined contribution plan," *Trauernicht*, 169 F.4th at 474, or if "intra-class conflicts" exist that render the interests of those within a single class "not aligned." *Sharp Farms v. Speaks*, 917 F.3d 276, 306 (4th Cir. 2019) (Quattlebaum, J., concurring) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997)).

The "rigorous analysis" requirement ensures that Rule 23's criteria exist in fact and not merely in theory. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011)). It also "allow[s] for meaningful appellate review." *Zetia*, 7 F.4th at 236, 239.

The district court's class-certification decision failed to apply these standards. The court did not perform anything resembling a rigorous analysis of predominance, commonality, typicality, or adequacy. That analytical void is especially troubling here. Plaintiffs did not, and could not, demonstrate that *any* of those prerequisites (let alone all of them) are satisfied given the individualized questions of injury in this defined-contribution plan context and the fundamental conflicts of interest within this sprawling class. Moreover, the district court's determination of Article III standing defies Supreme Court precedent. These errors require that the decision below be reversed.

## I. The district court did not rigorously analyze the predominance or commonality prerequisites, which were not satisfied here.

This Court recently explained that "(b)(3) class actions represent a potential threat to Rule 23's fragile equipoise," because "as variation amongst class members increases, collective resolution of their claims becomes a more complicated and daunting affair"—and "the scale tips against invoking the class-action mechanism." *Overby*, 178 F.4th at 182. Rule 23's commonality and predominance requirements are intended to ferret out whether adjudication by representation is appropriate.

Commonality requires plaintiffs seeking certification to show, among other things, that they "suffered the same injury," regardless whether there are some common questions as to liability. *Trauernicht*, 169 F.4th at 473 (quoting *Wal-Mart*, 564 U.S. at 350 (emphasis omitted)). And Rule 23(b)(3)'s predominance criterion establishes even a "far more demanding" standard of proving that common questions predominate over individual ones. *Amchem*, 521 U.S. at 623-624.

Given the due process issues at play (for plaintiffs and defendants), courts must remain vigilant not to conduct "commonality and predominance analyses … at such high levels of generality" that "may mask a multitude of disparities" among the class. *Overby*, 178 F.4th at 182 (citation omitted). Particularly for 23(b)(3) classes, they "must … observe carefully the predominance and superiority criteria to ensure that 'resources are not wasted pursuing litigation that is aggregate only in theory,' and that defendants need not face the choice of whether to 'settle or bet the store.'" *Id.* (quoting *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 678, 683 (4th Cir. 2024)). As explained below, the district court wholly failed to do so here.

### A. The district court's failure to conduct a rigorous analysis of predominance and commonality is a *per se* abuse of discretion.

Before granting class certification, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT*, 764 F.3d at 358. This Court requires district courts to "conduct the requisite full-throated analysis" with sufficient explanation to (at a

minimum) "allow for meaningful appellate review." *Zetia*, 7 F.4th at 236, 239; *accord In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017); *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020). Indeed, "failing to provide a 'rigorous analysis' sufficient to enable [this Court] to conduct meaningful appellate review" is categorically an abuse of discretion. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 306 (4th Cir. 2013).

This case is a posterchild of class certification absent "the requisite full-throated analysis." *Zetia*, 7 F.4th at 239. Far from taking a "close look," the district court offered *no* analysis to support its finding of predominance—even though predominance is supposed to be "far more demanding" than commonality. *Amchem*, 621 U.S. at 623-624. Because Plaintiffs did not move under Rule 23(b)(3), neither the parties nor the court addressed predominance during the first certification decision. The district court's *only* reference to predominance is the naked conclusion in its second certification order that "the Proposed Class satisfies the predominance and superiority criteria of Federal Rule of Civil Procedure 23(b)(3)." JA71. And while the court's certification order referenced "the reasons stated in open court" at the class-certification hearing, the district court never even mentioned predominance, much less substantively addressed that criterion. It is impossible to determine what evidence and reasons the district court relied upon in reaching its bare conclusion. And the failure to analyze predominance is all the more remarkable

because Plaintiffs did not move under Rule 23(b)(3) and argued after *Trauernicht* that Rule 23(b)(3) was satisfied based on the same evidence supporting their since-vacated 23(b)(1) class. *See* pp. 19, 21-22, *supra*. All the court offered was a "conclusion[], not reasons," which "do[es] not constitute a 'rigorous analysis.'" *Target*, 847 F.3d at 612.

The district court's one-sentence discussion of commonality is similarly lacking. With respect to Rule 23(b)(1), the district court acknowledged that *Trauernicht* controls this case and, consequently, "in light of *Trauernicht*" its "prior decision in certifying under (b)(1) is not correct." JA60-61. That is because, as in *Trauernicht*, "[P]laintiffs' claims in the context of a defined contribution plan are '*individualized* monetary claims' made against the fiduciary on behalf of the plan *with respect to individual accounts* in the plan." 169 F.4th at 472 (emphases added). On top of its Rule 23(b)(1) holding, *Trauernicht* directly applies this reasoning to the commonality prerequisite as well: "given that these are individualized claims, the district court needed to conduct a rigorous analysis to determine whether members of the class suffered the same injury, as required for finding commonality under Rule 23(a)(2)." *Id.*

Despite recognizing that *Trauernicht*'s reasoning governs this case, the district court refused to heed *Trauernicht*'s command that "a rigorous analysis of commonality … require[s] the court to address whether class members suffered

different injuries resulting from their different circumstances arising in the context of a defined contribution plan." 169 F.4th at 474. The district court explicitly rebuffed Defendants' urgings to address these individualized injuries. Instead, the court pointed vaguely to "the specific allegations here regarding excessive fees determined at the plan level" and added "that what the defendants really are arguing is essentially an issue of the allocation of damages, not the resolution of the legal issue as to whether or not there's been a breach of fiduciary duties based on excessive fees." JA61.

But Defendants' commonality argument was not about the allocation of damages nor whether breach could be determined based on common evidence of a single fiduciary process. (Neither was *Trauernicht*.) Rather, Defendants argued at length that, as in *Trauernicht*, "because the plaintiffs' and purported class members' individual circumstances differed dramatically and all did not suffer *the same injury*, their claims do not satisfy the class action prerequisite of commonality." 169 F.4th at 463 (emphasis added); *see* JA56-57, JA588-599. The district court, therefore, "legally erred—and thus abused its discretion—in finding satisfied the commonality prerequisite necessary for class certification" without "address[ing] commonality with any particularity." *Trauernicht*, 169 F.4th at 474.

Moreover, the district court's sole focus on "fees determined at the plan level" rather than how those fees applies to individual participants, is *precisely* what this

Court has repeatedly admonished against—conducting the commonality and predominance analyses "at such high levels of generality," which "may mask a multitude of disparities" among putative class members. *Overby*, 178 F.4th at 182 (quoting *Bojangles*, 123 F.4th at 680).

Likewise, the district court's focus on the Plaintiffs' "allegations" that fees were "determined at the plan level" (JA61) cannot be reconciled with this Court's repeated admonitions that district courts cannot rely on "merely pleaded facts" in undertaking the commonality and predominance analysis; the plaintiffs must "prove that there are *in fact* … common questions of law or fact, including that the members of the proposed class have suffered the same injury." *Trauernicht*, 169 F.4th at 473 (quoting *Wal-Mart*, 564 U.S. at 350-351) (quotation marks omitted); *see Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (district court erred "by accepting the plaintiffs' allegations for purposes of certifying a class"). Defendants provided extensive evidence that fees incurred by each participant's account were not uniform—they varied depending on each putative class member's account balance, investment selections, and timing of investments, among other things—and the district court was required to engage with this evidence, rather than simply credit the Plaintiffs' allegations. JA61. And those allegations are beside the point anyway: that a fiduciary process is conducted on behalf of a whole plan, and that fiduciary decisions (*e.g.*, the total fees a plan will be charged) are determined at the aggregate

level, says nothing about the *impact* on those decisions on all participants, *i.e.*, whether the participants suffered the same injury. Here, they have not.

Plaintiffs have tried to defend the district court's approach by arguing that the district court indicated at the hearing that it "considered [Defendants'] evidence and arguments concerning predominance." Opp. 20, *Mullins v. NRECA*, No. 26-165 (4th Cir. filed May 28, 2026), Dkt. 14-1; *see id.* at 16 (similar justification regarding commonality). But the absence of reviewable judicial analysis is reversible error regardless whether "the court had plenty of evidence before it"—even *if* "the hearing showed that the court was thoughtfully considering the issues"—because "the rigor requirement does not turn on how much material the parties submit or on how carefully the court seems to weigh the issues at a hearing. It instead asks whether the court's order sufficiently analyzes Rule 23." *Chavez*, 957 F.3d at 551.

If anything, the lack of rigor here should be particularly concerning because the district court issued not just one but *two* unreasoned class-certification orders, apparently believing that Defendants would be forced "to resolve this" case through settlement "now that the class has been certified." JA31; *accord* JA63. But the rigorous-analysis requirement tempers this "intense pressure on defendants to settle or face crippling 'blackmail settlements'" by ensuring Rule 23's exacting criteria are truly satisfied. *Overby*, 178 F.4th at 182 (citation omitted). They weren't here.

### B. Plaintiffs did not prove that the class satisfies the predominance and commonality prerequisites.

If the district court had conducted a properly rigorous analysis, it could not have found the predominance and commonality requirements satisfied based on the record before it.

1. As the Supreme Court made clear in *Wal-Mart* and this Court reiterated in *Trauernicht*, "Rule 23(a)(2) 'requires the plaintiff to demonstrate that the class members have suffered *the same injury*.'" *Trauernicht*, 169 F.4th at 473 (quoting *Wal-Mart*, 564 U.S. at 350). Plaintiffs' failure to make that demonstration "precludes finding commonality and necessarily predominance." *Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461, 466, 469 (4th Cir. 2025).

*Trauernicht* speaks directly to "same injury" analysis for claims like Plaintiffs' here, *i.e.*, fiduciary-breach claims under ERISA in the context of a defined-contribution plan. Such claims "are individualized claims" because they involve alleged injuries to plan assets held in plan participants' individual accounts, *Trauernicht* holds (169 F.4th at 469), and therefore they require a "rigorous analysis" of "whether class members suffered different injuries resulting from their different circumstances arising" (*id.* at 474).

In *Trauernicht*, the plaintiffs alleged that certain funds made available for investment as part of the uniform process involved in setting the plan line-up were imprudently selected and retained, in part because they performed worse than

alternative funds that "the plaintiffs proffered as appropriate comparators." *Id.* at 463-465. This Court explained that, in the "distinct context" of "a defined contribution plan, where the plan assets are allocated to individual accounts," "[t]he loss, if any, to each individual account in the plan … would vary significantly depending on factors like how much money a participant had invested in the imprudent fund, how long he had held the investment, and the precise timing of when he had bought and sold." *Id.* at 468. Given those individual variations, the Court held, "when ERISA § 502(a)(2) claims are brought in the context of a defined contribution plan, they are indeed 'individualized monetary claims' and therefore cannot be joined … in a mandatory class certified under Rule 23(b)(1)." *Id.* at 469.

*Trauernicht* then applied that reasoning to the "same injury" criterion of the commonality analysis. The fiduciaries argued that the plaintiffs' comparators were inapt and that, when compared to apt comparators, "many purported class members suffered no injury" so plainly "they did not suffer the same injury." *Id.* at 473. Given the parties' dispute about the appropriate comparators and the implications for whether the class suffered the same injury, this Court held that the district court erred in not "resolv[ing] whether, when determining injury," the comparators offered by the plaintiffs were truly apt. *Id.* at 474. The Court further held that the district court erred in not "address[ing] whether class members suffered different injuries resulting from their different circumstances arising in the context of a defined contribution

plan." *Id.* That is because "each plaintiff, as well as each class member, participated in the plan in a materially different way" across a number of dimensions: "Each participant made his or her own investment decisions … and the participant could change that decision on any given day"; "the participants selected different [funds] at different times during different market conditions"; "the different [funds] carried different risks, depending on the retirement date selected"; "each participant withdrew assets from the [p]lan at different times," and "the market performed uniquely each day." *Id.*

*Trauernicht*'s reasoning applies equally to the challenged fees here. The certified class includes "[a]ll participants" since 2020 who were charged *any* administrative fees. JA71. But Plaintiffs have never claimed that simply *paying for* administrative services constitutes injury. Rather, they claim injury from paying *excessive* fees—determined using their expert's (Scheinberg's) "comparator set" of 10 plans that supposedly had "similar scale, structural characteristics, and drivers of administrative complexity." JA799. The average direct per-participant administrative fees purportedly paid under that comparator set ranged from $69 to $310, which Scheinberg further flattened into a median-of-averages of "approximately $128 to $145." JA799.

As in *Trauernicht*, however, many class members suffered no injury at all from the Plan's administrative fees. More than 99% of participants paid a *lower*

percentage of their account assets than the Scheinberg comparators. JA1058-1060. And even expressed in Plaintiffs' own metric (per-participant fees), approximately half of Plan participants paid less for administrative services than the median-of-averages calculated by their own expert. *See* pp. 17-18, *supra*. This fact alone dooms any showing of predominance or commonality. As this Court has held, a "high share of class members with no demonstrable injury present[s] a predominance problem." *Mr. Dee's*, 127 F.4th at 933 (predominance not satisfied "where the plaintiffs' only expert witness failed to show harm for nearly one-third of the class"); *see also Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 328 (2025) (Kavanaugh, J., dissenting from dismissal of writ as improvidently granted) ("[W]hen a damages class includes both injured and uninjured members, common questions do not predominate."). Given the undisputed evidence that many class members actually fared better in this Plan than under Plaintiffs' own comparator plans, and therefore suffered no injury at all, the district court erred in finding the predominance and commonality criteria satisfied.

Moreover, as in *Trauernicht*, even class members who did pay allegedly excessive direct fees did not all suffer *the same injury*, because each class member "participated in the plan in a materially different way." 169 F.4th at 474. Recall that (1) administrative fees were asset-based (rather than a fixed-dollar per-participant amount), (2) different investment options had different administrative

expense ratios, (3) those expense ratios changed over time, and (4) the amounts charged to individual participant accounts depended not only on the investments chosen but on the putative class member's account balance. *See* pp. 11-12, *supra*. Given the combined effect of these variables, annual fees ranged from $0 at the 1st percentile to approximately $3,000 at the 99th percentile from 2020-2024. JA1052-1053, JA1129. Plan participants in the 25th percentile paid approximately $30/year and 40% of Plan participants paid less than $100/year—while, at the other extreme, approximately 20% of Plan participants paid over $500/year. JA1052-1053.

Furthermore, any assessment of a particular class member's injury must compare what the class member actually paid to what they would have paid under an alternative, supposedly prudent fee system—hence Plaintiffs' reliance on the Scheinberg comparator plans. *See Trauernicht*, 169 F.4th at 463 (explaining that "many persons included in the class suffered *no* injury, as they fared better for having made their investments in the [challenged funds] than they would have had they invested in an appropriate substitute fund"). But that inquiry cannot be done on a class-wide basis, as the Scheinberg comparator plans themselves demonstrate. Several of those proffered comparators impose asset-based fees that vary with each participating employer's plan assets. JA1055-1057. By way of illustration, the following chart identifies the sliding scale of asset-based fees imposed by three of the Scheinberg comparator plans—Engage PEO, Questco Companies, and Vensure

Employer services—which imposed fees in different tiers depending on employer-level plan assets (*i.e.*, the amount of assets invested through the Plan attributable to each employer and its participating employees):

**Illustrative Asset-Based Fee Schedules for Scheinberg Comparators Charging Fees Based on Plan Assets**

| Participating Employer Plan Size | Engage PEO[189] | Questco Companies[190] | Vensure Employer Services[191] |
|---|---|---|---|
| $0 - $500,000 | 0.70% | 0.80% | 0.60% |
| $500,000 - $600,000 | 0.70% | 0.70% | 0.60% |
| $600,000 - $1M | 0.60% | 0.70% | 0.50% |
| $1M - $2M | 0.35% | 0.55% | 0.40% |
| $2M - $3M | 0.26% | 0.45% | 0.30% |
| $3M - $4M | 0.26% | 0.35% | 0.25% |
| $4M - $5M | 0.18% | 0.30% | 0.20% |
| $5M - $7M | 0.18% | 0.25% | 0.20% |
| $7M+ | 0.18% | 0.25% | 0.13% |

JA1057. The NRECA Plan, in contrast, does not vary its asset-based fees depending on the assets invested by each employer; instead, the variations occur at the level of each individual's account balance and selection of particular investment options at particular times. JA1055-1057; pp. 11-12, *supra*. Accordingly, Plan participants whose employers had larger pools of plan assets—approximately 40% to 50% of participating subgroups had plan assets of $5 million or more during the class period, JA1068-1069—would pay *lower* expense ratios under several comparators' tiered asset-based fee structures, all else being equal, than under the NRECA plan. And Plan participants whose employers had smaller pools of plan assets (approximately 20% of participating subgroups had plan assets below $1 million) would pay *higher*

expense ratios under those comparators. JA1068-1069. The following chart illustrates that divergence for one of Scheinberg's comparators:

**Illustrative Comparison of Asset-Based Fees for NRECA and Scheinberg Comparator 2020**

| Plan size | Number of Subgroups[223] | Engage PEO Asset Based Fees[224] | NRECA Asset Based Fees[225] |
|---|---|---|---|
| $0 - $500,000 | 251 | 0.70% | 0.23% |
| $500,000 - $600,000 | 34 | 0.70% | 0.23% |
| $600,000 - $1M | 92 | 0.60% | 0.23% |
| $1M - $2M | 188 | 0.35% | 0.23% |
| $2M - $3M | 132 | 0.26% | 0.23% |
| $3M - $4M | 105 | 0.26% | 0.23% |
| $4M - $5M | 102 | 0.18% | 0.23% |
| $5M - $7M | 161 | 0.18% | 0.23% |
| $7M+ | 480 | 0.18% | 0.23% |

JA1070. Compounding these individualized questions, many Scheinberg comparators impose *separate* fees whenever a participant elects to execute certain transactions (*e.g.*, a fee to set up a loan and an annual fee to maintain it), but that is not true of NRECA's Plan. JA1070-1071, JA1085-1086, JA1091-1092; *see* p. 11, *supra*. To assess what a given Plan participant's fees would be under one of the Scheinberg comparator plans, therefore, those separate transaction fees would have to be factored in as well—and they naturally vary based on any given participant's actual transaction history.

Plaintiffs' expert tries to paper over these individualized issues by flattening the range of administrative fees charged to participants in his comparator plans into an *average* direct per-participant fee. *See* p. 18, *supra*. But courts consistently reject class-certification analyses exactly like the one offered here that improperly rely on

"averages" to "mask individualized injury." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020); *accord Anderson v. Lab'y Corp. of Am. Holdings*, 2023 WL 1970953, at *10 (M.D.N.C. Feb. 13, 2023) (collecting cases); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (class certification should be denied when an expert's model "masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class"); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *9 (W.D. Mo. Nov. 9, 2021) (rejecting "average overcharge" calculation that "masks … individualized evidence").

Other variations among the class also bear heavily on whether, and how, particular Plan participants suffered injuries. In addition to paying a wide range of fees, different class members from different co-ops received widely different benefits from the administrative services offered. As noted above, smaller cooperatives often rely more heavily on NRECA for full-service "white-glove" administration, payroll integration, and participant education services, while larger co-ops are more likely to have their own staff perform these functions. JA1035-1040. Some co-ops offer more complex features, such as loans; others do not. JA1040-1047. To the extent they were injured at all, participants who paid supposedly excessive administrative fees while receiving particularly high-value,

white-glove services did not suffer the *same injury* as those participants belonging to co-ops that had little use for or declined those services.

2. On top of the "same injury" requirement discussed in *Trauernicht*, the predominance criterion was not satisfied because each class member will need to present *individualized evidence* to establish their own Article III standing.

"Every class member must have Article III standing in order to recover individual damages" because "'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted). And the Supreme Court's precedent "clearly requires … a *factual* showing for each class member to claim damages." *Alig v. Rocket Mortg., LLC*, 126 F.4th 965, 975 (4th Cir. 2025). Thus, if this case goes to trial and Plaintiffs prevail, *each of the approximately 100,000 class members* will ultimately need to prove that they personally were injured by the Plan's fees to collect any damages.

In some cases, that might be an easy lift. In a plan where, for example, every participant is charged the exact same flat-dollar per-participant fee and the putative class offers plan-wide evidence showing that the flat-dollar per-participant fee was excessive, the existence of every participant's injury may rise or fall on that common evidence. But that is not how the NRECA Plan is structured or how Plaintiffs presented the record. Instead, the undisputed record shows that each participant pays

a different amount depending on her investment selections, account balance, and the associated administrative expense ratios, all of which can change over time. And Plaintiffs did not develop record evidence comparing aggregate Plan fees to another plan's aggregate fees; instead, they only developed evidence of average per-participant fees versus other average per-participant fees.

The necessity of 100,000 individualized showings of concrete injury—based on individualized evidence of each class member's unique participation in the Plan—means that common questions do not predominate. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (brackets and citation omitted). Here, the evidence necessary to establish each class member's injury-in-fact certainly "varies from member to member." *Id.* (citation omitted). Each class member will need to show that she was *actually* injured by the alleged ERISA violations—that is, that she paid more in fees as a result of the alleged fiduciary breaches than she would have paid under a different (prudent) administrative-fee arrangement. That inquiry requires reviewing *each* participant's account balance, investment selections, expense ratios across specific time windows (which varies with each participant), and optional

services (like participant loans), then comparing the total fees *paid by that individual Plan participant* to what she would have paid under an alternative service-provider arrangement. Surely, common questions do not predominate in a class that calls for mini-trials on each class member's standing.

In *Mr. Dee's*, this Court approvingly cited the Eleventh Circuit's precedent "emphasizing the importance of Rule 23's predominance requirement post-*TransUnion* 'because a district court must ultimately weed out plaintiffs who do not have Article III standing before damages are awarded to a class.'" 127 F.4th at 934 (quoting *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 891 (11th Cir. 2023)). "In some cases, whether absent class members can establish standing may be exceedingly relevant to the class certification analysis required by Federal Rule of Civil Procedure 23." *Green-Cooper*, 73 F.4th at 891 (citation omitted). This case perfectly fits that description because the individualized evidence needed to prove each class member's standing precludes a finding of predominance. *See Mr. Dee's*, 127 F.4th at 933 (no predominance when, "even among the class members that arguably did show injury, the circumstances surrounding the payment of shipping fees varied substantially").

3. Defendants' statute-of-limitations defense, which turns on each class member's "actual knowledge," 29 U.S.C. § 1113(2), also defeats predominance. With respect to similar statute-of-limitations defenses, this Court has regularly held

that "a plaintiff's knowledge typically requires individual evidence…, which will frequently defeat Rule 23's requirements." *EQT*, 764 F.3d at 370; *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320-321 (4th Cir. 2006) (statute-of-limitations defense was "not readily susceptible to class-wide determination" given knowledge element). Indeed, in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998), this Court embraced the principle that "when the defendant's 'affirmative defenses (*such as the statute of limitations*) may depend on facts peculiar to each plaintiff's case,' class certification is erroneous." *Id.* (ellipsis and citation omitted; emphasis added).

So too here. ERISA's statute of limitations applies to each class member individually, based on whether and when that class member acquired "actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). This means "the plaintiff must in fact have become aware of that information," and therefore "requires more than evidence of disclosure alone." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 186-187 (2020).[3] Yet parties can "prove actual knowledge" in a variety of ways, including a plaintiff's deposition testimony as to whether she "recall[s] reading particular disclosures" and through "'inference from

[3] At oral argument in *Intel*, Justice Kagan specifically flagged that the plaintiffs' stringent "actual knowledge" standard could create class-certification challenges. Arg. Tr. 44, https://tinyurl.com/2vycdzmx ( "It is a little bit like be careful what you wish for, isn't it?").

circumstantial evidence'"—*e.g.*, "electronic records showing that a plaintiff viewed the relevant disclosures and evidence suggesting that the plaintiff took action in response to the information contained in them." *Id.* at 189-190 (citation omitted). "[E]vidence of 'willful blindness'" may also suffice. *Id.* at 190 (citation omitted).

The statute-of-limitations defense here will therefore require individualized evidence—including deposition testimony and electronic records—as to whether, when, and what *each class member* knew about the allegedly "excessive" administrative fees and Defendants' retention of NRECA to provide administrative services. JA93-94. Many class members—including the named Plaintiffs—were also absent class members in the *Intravaia* litigation and were therefore sent notices in 2020 describing the settlement agreement in that case, which reflected that NRECA was a paid service provider to the Plan. JA100, JA980. Each named Plaintiff also received electronic records reflecting fees paid to NRECA in 2018 or 2019, and they were questioned about their contemporaneous knowledge of those records. JA279-280, JA301, JA317, JA620. The statute-of-limitations defense demands a similar investigation into *each absent class member's* actual knowledge, which precludes a finding of predominance.

Moreover, ERISA's statute of limitations operates differently with respect to fiduciary-breach claims (under 29 U.S.C. § 1104) and prohibited-transaction claims (under § 1106): "in a section 1104 case, the plaintiff must be aware that the defendant

has acted and that those acts were imprudent," whereas in "a section 1106 case the plaintiff need only be aware that the defendant has engaged in a prohibited transaction, because knowledge of the transaction is all that is necessary to know that a prohibited transaction has occurred." *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1044 n.5 (9th Cir. 2020) (citation omitted). Thus, an individual class member may have had "actual knowledge" of the alleged prohibited transaction outside the limitations period but not of the alleged fiduciary breach. Where, as here, "[P]laintiffs assert a diverse array of claims," it is an abuse of discretion when "the court fail[s] to consider whether any of the unique elements of those claims would affect the predominance analysis" for any of those claims. *EQT*, 764 F.3d at 367 n.19.

* * *

The district court did not conduct anything approaching a "rigorous analysis" before finding the predominance and commonality requirements met. And the record shows that Plaintiffs had *not* carried their burden of proving those requirements are met. A class of 100,000 current and former participants hailing from 900 co-ops and more than 1500 co-op subgroups did not suffer the same injury—indeed, many suffered *no* injury—and the evidence needed to prove each class member's concrete injury and adjudicate Defendants' statute-of-limitations defense is exceedingly individualized. This Court should reverse the district court's

class-certification decision and hold that this class cannot be certified under Rule 23(b)(3).

## II. The district court abused its discretion by ignoring fundamental intraclass conflicts and deeming the typicality and adequacy criteria satisfied with no analysis.

Plaintiffs' failure to carry their burden of proving that the typicality and adequacy prerequisites are satisfied provides independent reason for reversal. *See* Fed. R. Civ. P. 23(a)(3)-(4). These requirements "tend to merge" with one another and with the commonality requirement. *Wal-Mart*, 564 U.S. at 349 n.5.

The typicality criterion ensures that "the representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). This Court has "readily denied class certification" "when the variation in claims strikes at the heart of the respective causes of actions." *Id.* at 466-467. Likewise, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. This requirement has constitutional dimensions, because "basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard*, 155 F.3d at 338. "'Adequacy does not require complete identity of claims or interests between the proposed representatives and the class,' but there must be 'sufficient similarity of interest such that there is no affirmative

antagonism between the representatives and the class.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 297 (4th Cir. 2019) (brackets and citation omitted).

Where different sub-groups within a class "have potentially divergent aims," and the named plaintiffs are pursuing only one of those aims, a serious conflict of interests arises. *See id.* at 307 (Quattlebaum, J., concurring) (quoting *Broussard*, 155 F.3d at 339). And where the presence of intra-class conflicts forces a defendant "to respond to inconsistent legal theories and damages claims," those conflicts also infringe the due process rights of the defendant. *Id.*

At least two fundamental intraclass conflicts plague the expansive class certified here.

***1. Higher Account Balances vs. Lower Account Balances.*** The named Plaintiffs' accounts had account balances well below the average Plan participant's balance throughout the class period. JA1088-1089. Due to the Plan's asset-based fee structure, therefore, the actual administrative fees paid by Mullins and Sunderlin were much lower than the average Plan participant's. JA1088-1089; pp. 14-15, *supra*.

This misalignment generates a fundamental conflict with the interests of class members with significantly higher account balances. The interest of higher-balance class members would be in attacking the Plan's asset-based fee structure itself as imprudent, since they would pay less under a fixed-dollar per-participant fee

structure. Indeed, Plaintiffs' other expert, David Donaldson, actually opined that "NRECA should have used a fixed fee structure," which is supposedly more consistent with "fiduciary best practices." JA865 (capitalization altered). He opined that "NRECA's current approach allocates a *larger share of plan administrative costs to participants with higher account balances*, even though those participants do not receive proportionally greater administrative services," and that it was imprudent not to analyze alternative recordkeeping fee methodologies, *including a fixed dollar approach*." JA865-866 (emphasis added).

Conspicuously, after serving the Donaldson report, the named Plaintiffs not only declined to assert an asset-based theory of fiduciary breach, they explicitly *disavowed* the argument "that NRECA was required to adopt a fixed per-participant fee structure." JA1234. There is an obvious reason why the named Plaintiffs have run away from Donaldson's criticisms: as lower-balance account holders, they personally *benefited* from NRECA's asset-based fee structure. They therefore cannot seriously advance any theory of breach on the grounds that NRECA should have adopted a universal flat-fee structure, because they would have been charged *more* in fees under such an arrangement. *See TransUnion*, 594 U.S. at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (citation omitted)). So Mullins and Sunderlin sacrificed this theory of liability, against the interests of absent class members who had higher

account balances during the class period and therefore paid more as a result of the Plan's asset-based fee structure. And meanwhile, Defendants were left "forced … to respond to inconsistent legal theories and damages claims," as Plaintiffs changed their theory from expert discovery to class-certification and summary-judgment briefing. *Sharp Farms*, 617 F.3d at 307 (Quattlebaum, J., concurring).

That is a "manifest conflicts of interest within" the certified class, *Broussard*, 155 F.3d at 338, and one that demonstrates "affirmative antagonism between the representatives and the class" with respect to issues at the heart of the litigation, *Sharp Farms*, 917 F.3d at 297 (brackets and citation omitted); *see* 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:30 (22nd ed.) ("The paradigmatic fundamental conflict arises where the same conduct benefits certain members of the putative class while harming other members of the same putative class.").

***2. Large Employers vs. Small Employers.*** Both Mullins and Sunderlin worked for co-ops that are substantially larger and better resourced than nearly all other co-ops in the Plan: while the average co-op had between 75 and 85 participants during the putative class period, Mullins's co-op is one of the five largest with over 800 participants, and Sunderlin's former employer had over 290 participants—larger than more than 95% of participating employers. JA1086-1087; *see* pp. 13-14, *supra*. With respect to the excessive-fees issue at the heart of this litigation, the interests of Plan participants with large employers (like the named Plaintiffs) are not aligned

with those of Plan participants with smaller employers. In fact, those two groups' interests are affirmatively antagonistic.

*First*, as discussed above (at 5, 10, *supra*), NRECA is a not-for-profit entity that provides its administrative services *at cost*. JA722, JA733. Any significant reduction in costs, therefore, entails a corresponding reduction in services provided through the Plan. Depending on the services cut, bigger co-ops might get along just fine. They "typically maintain dedicated HR and benefits staff who can perform some of the necessary day-to-day plan-related administrative functions internally," Defendants' expert explained, in contrast to smaller co-ops that "depend more extensively on NRECA for administrative support" and "consume a disproportionately greater level of support services." JA1039-1040. Both Mullins's and Sunderlin's co-ops, for instance, have internal HR and benefits personnel, *see* JA268, JA315, and, accordingly, require less support from NRECA than smaller co-ops without those resources. In contrast, the smaller co-ops "benefit disproportionately from the economies of scale, administrative infrastructure, and integrated service model offered by NRECA—benefits that would be unavailable or prohibitively expensive for them to replicate outside the MEP structure as stand-alone plans." JA1087.

No wonder, then, that Mullins and Sunderlin do not want to pay for services that are far less valuable to bigger co-ops than to smaller ones. Yet their personal

interest in lower costs is directly antagonistic to the interests of absent class members from smaller co-ops who benefit from the administrative infrastructure and integrated service model offered by NRECA—indeed, whose employers may not even be able to offer a retirement plan without these services.

*Second*, as noted above (at 17, 41, *supra*), Plaintiffs' expert has put forward comparator plans that use a *tiered* asset-based fee structure: participants from larger employers with more plan assets benefit from lower expense ratios than participants from smaller employers with fewer plan assets. JA1069. It would be understandable for Mullins and Sunderlin to fault Defendants for not adopting *that* structure, since that scheme redounds to the benefit of participants from large employers (like the named Plaintiffs) that tend to have more plan assets. But such a fee structure would *harm* participants from smaller plans with fewer plan assets; their expense ratios would rise. Thus, Plaintiffs' choice of comparator plans exposes another deep conflict between participants hailing from larger co-ops and those from smaller ones.

This conflict is no small matter—nearly [redacted] of NRECA co-ops have fewer than [redacted] participating employees, and fully [redacted] have fewer than [redacted] participants. Thus, the vast majority of Plan participants could be seriously harmed through a reduction in much-needed services should the named Plaintiffs' theories prevail.

These conflicts preclude class certification. In *Sharp Farms*, for instance, this Court rejected the argument that two subsets of a certified class were not in conflict

because they both sought to recover "excess" funds. 917 F.3d at 297. Rather, the Court explained, each of the two groups "assert[s] a fundamentally different interest and a different injury," with "different theories of the case, and these theories are in tension." *Id.* One group (which actually contributed to the reserves) based their claim of "legal entitlement to the reserve funds on common law and statutory theories," while the other group (which included members who did not contribute to the reserves fund) could not rely on such theories, so they pursued weaker claims "for *voluntary* distribution or, alternatively, dissolution." *Id.* That was a fundamental intraclass conflict, the Court held, because "awarding to noncontributing members a portion of the reserve funds" would "vitiate" the interest of the contributing members. *Id.*

So too here—though in some ways worse, because the interest of smaller co-ops are not being asserted by *anyone*, since both named Plaintiffs hail from large employers. Class members with higher account balances might be interested in challenging the asset-based fee structure, while class members with lower account balances (like Mullins and Sunderlin) have the opposite interest—because they *benefit* from that structure. Likewise, class members belonging to smaller employers have a strong interest in *preserving* the services NRECA provides at cost, and in *not* adopting a tiered structure like many of the Scheinberg comparators. Again, class members like Mullins and Sunderlin, whose employers are some of the largest in the

Plan, have precisely the opposite interest. These are "paradigmatic fundamental conflict[s]," because "the same conduct benefits certain members of the putative class while harming other members of the same putative class." 1 McLaughlin on Class Actions § 4:30.

Instead of grappling with these "manifest conflicts of interest," "the district court simply, and erroneously, ignored" them. *Broussard*, 155 F.3d at 338. The district court did not address commonality or typicality at either hearing—the sole mention of these concepts was a one-sentence conclusion, without *any* reasoning, that the "numerosity, commonality, typicality, and adequacy" requirements had been met." JA31; *accord* JA34, JA71. At a minimum, therefore, "the district court abused its discretion by failing to provide a 'rigorous analysis' sufficient to enable [this Court] to conduct meaningful appellate review," *Ealy*, 514 F. App'x at 306.

Regardless, no degree of analysis could save this class. While "basic due process requires that named plaintiffs possess undivided loyalties to absent class members," *Broussard*, 155 F.3d at 338, Mullins's and Sunderlin's interests are fundamentally and manifestly at odds with significant portions of the class across multiple axes. It follows that their claims are not typical of the class and they cannot adequately represent it.

## III. The named Plaintiffs have not established Article III standing.

"Article III standing is a necessary threshold issue when reviewing a class-certification order under Rule 23(f)." *Freeman*, 149 F.4th at 467 (alteration and quotation marks omitted). This is both a jurisdictional requirement and a Rule 23 prerequisite, because "without standing, [the representative's] claim cannot be typical of the class members' claims." *Id.* "Without a sufficient allegation of harm *to the named plaintiff[s] in particular*, [they] cannot meet [their] burden of establishing standing." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (citation omitted). And where, as here, Defendants lodge a "factual challenge" to Plaintiffs' standing, "'the presumption of truthfulness normally accorded a complaint's allegations does not apply.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (citation omitted).

Since the fees paid by each named Plaintiff fell within (or below) the average direct per-participant fees paid by Plaintiffs' purported comparator benchmark plans, Defendants challenged the named Plaintiffs' Article III standing both before and after this Court's *Trauernicht* decision. JA604, JA966-969. The district court also glossed over this issue. Its only *mention* of standing was a cryptic statement at the first class-certification hearing that "the plaintiffs have adequately alleged Article III standing under 502(a)(2) of ERISA." JA31. That conclusion apparently adopted Plaintiffs' argument that, "[i]n an ERISA § 502(a)(2) action, a plan participant has

Article III standing where *the plan* 'has suffered an injury in fact.'" JA774 (emphasis added; citation omitted). But the Supreme Court rejected exactly that argument in *Thole v. U.S. Bank N.A.*, holding that "the cause of action does not affect the Article III standing analysis" even when plaintiffs file suit under "ERISA §§ 502(a)(2), (3)." 590 U.S. 538, 544 (2020).

The district court did not identify any other grounds for Article III standing—much less rigorously analyze the issue—and Plaintiffs failed to demonstrate one. If anything, their evidence actually refuted standing. JA966-969. The named Plaintiffs' total administrative and recordkeeping fees were well within (or substantially below) the average per-participant fees paid by the comparator plans offered by their own expert—Plaintiffs' chosen metric for supposedly establishing injury from excessive administrative fees. JA1090. If the named Plaintiffs would have paid the same or less under *their own expert's* comparators—which were Plaintiffs' *sole* evidence and theory of injury—they suffered no individualized injury traceable to the alleged ERISA violations and therefore lack standing.

Moreover, Scheinberg's comparators have significant hidden fees that are not factored into his analysis. Scheinberg relies on data reported in Forms 5500 to calculate the per-participant administrative and recordkeeping fees of his comparator plans, but Defendants' expert explained that this "data excludes certain forms of unreported indirect compensation, such as revenue sharing amounts received from

certain investment options, and therefore often *understates total administrative and recordkeeping fees*." JA1055-1056 (emphasis added); *see also* JA1059-1060, JA1065-1067. In particular, the NRECA Plan has no revenue sharing, while many Scheinberg comparators—including the comparator plan with the lowest fees, Pacific Dental—use revenue sharing to compensate plan service providers. JA1058. And though the Plan's independent fiduciary viewed NRECA as offering a *particularly high* level of services compared with those typically observed in the industry, JA824-825, JA880-882, nowhere did Scheinberg attempt to determine the value of the services offered by his comparators. In fact, he testified he does not know what services those plans provide. JA683-684. In other words, the *true* fees imposed by the Scheinberg comparators are higher than the numbers he lists, while the true value of services offered for the fees paid are completely ignored. This only underscores that the named Plaintiffs suffered no injury in paying *lower* fees under the NRECA Plan.

Accordingly, the named Plaintiffs failed to "demonstrate personal harm," *Freeman*, 149 F.4th at 467, and the district court never engaged with that threshold issue. Instead, the court erroneously believed that Article III standing was satisfied simply by bringing a claim "under 502(a)(2) of ERISA." JA31. That was an abuse of discretion. *See Fernandez*, 116 F.4th at 300-301 (vacating class-certification order when "the district court's standing analysis was erroneous").

## CONCLUSION

For the foregoing reasons, the Court should reverse the order certifying the class.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Jordan Bock*
Jordan Bock
*Counsel of Record*
James O. Fleckner
Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*jbock@goodwinlaw.com*

Christina L. Hennecken
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000

Nehama Hanoch
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

*Counsel for Appellants National Rural Electric Cooperative Association and the Insurance and Financial Services Committee*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a), Appellants state that this appeal presents important questions about the certification of a damages class under Rule 23(b)(3) and the application of *Trauernicht v. Genworth Financial, Inc.*, 169 F.4th 459 (4th Cir. 2026) in the context of ERISA claims for excessive fees against a multiple employer plan. Accordingly, Appellants respectfully submit that oral argument would aid this Court's decisional process.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,987 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it appears in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 10, 2026

*/s/ Jordan Bock*

Jordan Bock
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1000
*jbock@goodwinlaw.com*

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, I electronically filed the foregoing using the Court's CM/ECF system.

Dated: September 10, 2026

*/s/ Jordan Bock*

Jordan Bock
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*jbock@goodwinlaw.com*

*Counsel for Appellants*