No. 26-1823

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

JOHN MULLINS and THOMAS SUNDERLIN, individually and as representatives of a class of similarly situated persons, on behalf of the 401(k) Pension Plan,

*Plaintiffs-Appellees*,

v.

NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION and the INSURANCE AND FINANCIAL SERVICES COMMITTEE,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia,
No. 1:25-CV-00994-MSN-IDD (Hon. Michael S. Nachmanoff)

**REDACTED FINAL FORM RESPONSE BRIEF FOR APPELLEES**

Roland Tellis
David Fernandes
Sterling Cluff
Kelsey Elling
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436

Catherine Dorsey
*Counsel of Record*
**BARON & BUDD, P.C.**
2600 Virginia Avenue NW, Suite 900
Washington, D.C. 20037

*Counsel for Plaintiffs-Appellees*

## DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Plaintiffs-Appellees John Mullins and Thomas Sunderlin state that they are natural persons.

# TABLE OF CONTENTS

INTRODUCTION ....................1

JURISDICTIONAL STATEMENT ....................4

STATEMENT OF ISSUES ....................4

STATEMENT OF CASE ....................5

I. The Plan and the Parties ....................5

II. The Plan's Administrative Fee Structure ....................6

A. NRECA Contracted with and Billed the Plan, not Individual Participants ....................6

B. The Plan used a Common Service and Fee Structure ....................7

C. Plaintiffs Challenge the Plan-wide Process Used to Approve NRECA's Compensation ....................8

D. Plaintiffs' Experts Evaluated the Plan's Fiduciary Process and Administrative Expenses ....................10

III. The District Court's Certification Process ....................11

A. The District Court Granted Class Certification After Thoroughly Considering the Parties' Arguments and Evidence ....................11

B. The District Court Vacated Its Initial Certification Order and Ordered Supplemental Briefing after *Trauernicht* ....................12

C. The District Court Granted Certification under Rule 23(b)(3) After Fully Considering the Expanded Record and Holding a Second Hearing ....................13

SUMMARY OF ARGUMENT ....................16

STANDARD OF REVIEW ....................18

ARGUMENT ....................19

I. The District Court Rigorously Analyzed Rule 23 ....................19

A. The Full Certification Record Shows the District Court's Rule 23 Analysis ....................19

B. Considering the Entire Record, the District Court Did Not Abuse Its Discretion by Issuing a Succinct Order .....24

II. The District Court Did Not Abuse Its Discretion in Finding that the Class Satisfies Commonality and Predominance .....28

A. The District Court Reasonably Found that the Alleged Injury is Common to the Class .....29

i. The District Court Reasonably Distinguished *Trauernicht* .....29

ii. Defendants' Comparator Median Argument Does Not Establish an Abuse of Discretion .....34

iii. Defendants' Remaining Criticisms Do Not Establish an Abuse of Discretion .....36

iv. Defendants' Averaging Cases Do Not Establish an Abuse of Discretion .....38

B. Defendants' Individualized Standing Argument Does Not Defeat Predominance .....40

C. Defendants' Statute of Limitations Defense Does Not Defeat Predominance .....43

III. Defendants' Typicality and Adequacy Arguments Do Not Show that the District Court Abused Its Discretion .....46

A. Defendants' Speculative Intraclass Conflict Theories Do Not Establish an Abuse of Discretion .....47

B. The Record Supports the District Court's Typicality Determination .....49

C. The Record Supports the District Court's Adequacy Determination .....52

IV. Plaintiffs Established Article III Standing .....55

CONCLUSION .....60

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Lab'y Corp. of Am. Holdings*,
2023 WL 1970953 (M.D.N.C. Feb. 13, 2023) ....................39

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ....................59

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ....................*passim*

*Butler v. Sears, Roebuck and Co.*,
727 F.3d 796 (7th Cir. 2013) ....................29

*Chavez v. Plan Benefit Services, Inc.*,
957 F.3d 542 (5th Cir. 2020) ....................26, 27, 28

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ....................49, 51

*Dreher v. Experian Information Solutions, Inc.*,
856 F.3d 337 (4th Cir. 2017) ....................59

*Ealy v. Pinkerton Gov't Servs., Inc.*,
514 Fed. App'x 299 (4th Cir. 2013) ....................25, 28

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ....................19, 44

*Freeman v. Progressive Direct Insurance Co.*,
149 F.4th 461 (4th Cir. 2025) ....................59

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ....................19, 27, 28

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....................19

*Green-Cooper v. Brinker International, Inc.*,
73 F.4th 883 (11th Cir. 2023) ....................43

*Guenther v. Lockheed Martin Corp.*,
972 F.3d 1043 (9th Cir. 2020) ....................................................................45

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ..............................................................50, 53

*Intel Corp. Investment Policy Committee v. Sulyma*,
589 U.S. 178 (2020)...................................................................................45

*Intravaia v. NRECA*,
No. 1:19-cv-00973-LO-IDD (E.D. Va.) ...........................................*passim*

*Mr. Dee's Inc. v. Inmar, Inc.*,
127 F.4th 925 (4th Cir. 2025) ...................................................20, 42, 43

*Oliver v. Navy Fed. Credit Union*,
167 F.4th 106 (4th Cir. 2026) ...................................................................24

*Peters v. Aetna Inc.*,
2 F.4th 199 (4th Cir. 2021) ...............................................................*passim*

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) .....................................................................24

*In re Target Corp. Customer Data Sec. Breach Litig.*,
847 F.3d 608 (8th Cir. 2017) ...............................................................26, 28

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)...................................................................................59

*Thorn v. Jefferson-Pilot Life Insurance Co.*,
445 F.3d 311 (4th Cir. 2006) .....................................................................44

*Trauernicht v. Genworth Financial, Inc.*,
169 F.4th 459 (4th Cir. 2026) ............................................................*passim*

*Trauernicht v. Genworth Financial, Inc.*,
No. 24-1880 (4th Cir. Apr. 27, 2026)..................................................30, 31

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)...................................................................................41

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 19, 28

*Ward v. Dixie Nat. Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010) .......... 52, 53

**Statutes**

29 U.S.C. § 1113 .......... 44

**Other Authorities**

Federal Rule of Civil Procedure 23 .......... *passim*

# INTRODUCTION

Appellants-Defendants National Rural Electric Cooperative Association ("NRECA") and its Insurance and Financial Services Committee (the "Committee" and together, the "Defendants") are no strangers to ERISA violations. Twice before, they paid substantial sums arising from their shoddy administration of the NRECA 401(k) Pension Plan (the "Plan"). First, they paid more than $20 million to the Plan and millions more in civil penalties to the Department of Labor, and then another $10 million to settle a prior ERISA class action. Unable to again defend their conduct here, Defendants choose to attack the district court, insisting that it failed to adequately analyze Rule 23. The record shows otherwise.

The district court did precisely what Rule 23 requires. It considered hundreds of pages of briefing and evidence, including expert reports, deposition testimony, Plan documents, and the parties' competing theories of liability and injury. It then held a certification hearing where it initially certified the class under Rule 23(b)(1). When this Court issued *Trauernicht v. Genworth Financial, Inc.*, 169 F.4th 459 (4th Cir. 2026), four days after the court initially certified the class, the court *sua sponte* ordered supplemental briefing, vacated its Rule 23(b)(1) certification order, considered additional evidence and argument, and held a second hearing focused substantially on *Trauernicht*. Only then did it certify the Class under Rule 23(b)(3).

Defendants nevertheless portray the district court's ruling as if none of that occurred. To be sure, the district court did not presume that ERISA claims are common. It distinguished *Trauernicht*, identified the Plan-level determination of administrative fees as the central common issue, considered Defendants' asserted participant-level differences, and concluded that those differences concern allocation of damages, not whether Defendants breached their fiduciary duties. Its reasoning was succinct, not absent.

The distinction from *Trauernicht* is fundamental. *Trauernicht* involved allegedly imprudent investments, where injury depended on each participant's investment decisions and performance. The same challenged investment could cause one participant a loss while producing a gain for another. This case is fundamentally different. It concerns one Plan, one fiduciary committee, one Administrative Services Agreement, and one Plan-level process for approving and paying NRECA's administrative fees. NRECA did not negotiate those fees with 70,000+ participants. It contracted with the Plan, established Plan-wide budgets, billed the Plan in the aggregate, and was paid from Plan assets. No participant selected NRECA, negotiated its compensation, approved its Plain-wide budgets, or could avoid the fees while remaining in the Plan.

Plaintiffs' claims therefore rise or fall on common proof. Was the process for evaluating and approving NRECA's compensation prudent? Did that process cause

the Plan to pay unreasonable administrative expenses? The answers depend on the same agreements, budgets, invoices, fiduciary records, benchmarking evidence, and expert testimony for every Class member. If Plaintiffs cannot prove that the Plan overpaid, the claims fail for everyone. If they can, the resulting Plan loss was borne by the accounts from which those expenses were collected.

Defendants try to convert differences in the allocation of that loss into differences in liability. But account balances and investment selections may affect how much of the Plan's expenses each participant ultimately bore; they do not determine whether Defendants employed a prudent process or caused the Plan to overpay NRECA. The district court reasonably treated those differences as matters of allocation.

Nor is there an Article III standing problem. Plaintiffs-Appellees John Mullins and Thomas Sunderlin ("Plaintiffs") allege that Defendants' fiduciary breaches caused the Plan to pay more than $100 million in excessive administrative expenses to NRECA. They seek disgorgement of NRECA's resulting gains on behalf of the Plan. They also allege a direct financial injury: the challenged administrative expenses were paid from Plan assets and allocated to participant accounts, including their own. Defendants' own expert calculated the administrative fees charged to Mullins and Sunderlin. Their concrete financial stake supplies precisely what Article III requires.

Ultimately, Appellants would transform a quintessentially Plan-level fiduciary claim into tens of thousands of individual lawsuits merely because a common Plan expense was allocated among individual accounts. Rule 23 requires no such result. The central liability questions can be answered once for the entire Class, and the district court acted within its discretion in finding that they should be.

The district court did not abuse its discretion, and its certification order should be affirmed. At minimum, if this Court concludes that the district court should have more fully articulated the analysis it plainly undertook, the appropriate remedy is remand for further explanation, not a reversal of class certification.

## **<u>JURISDICTIONAL STATEMENT</u>**

Plaintiffs do not contest Defendants' Jurisdictional Statement.

## **<u>STATEMENT OF ISSUES</u>**

1. Whether the district court conducted the rigorous analysis required by Rule 23 and, if further analysis by the district court is required, whether the proper remedy is a remand for that purpose rather than reversal of certification.

2. Whether the district court abused its discretion by finding commonality and predominance based on a single Plan-level fiduciary process and common proof, and typicality and adequacy because Plaintiffs challenge the same process and seek the same relief as the Class.

3. Whether Plaintiffs have Article III standing when their accounts were charged *pro rata* portions of the allegedly excessive fees paid by the Plan, and they seek restoration of the resulting Plan losses and disgorgement of NRECA's ill-gotten gains.

## STATEMENT OF CASE

### I. The Plan and the Parties

The Plan is an association-based multiple-employer defined contribution plan. JA818. The Plan serves employees of more than 900 rural electric cooperatives, consisting of more than 70,000 participants during the class period, and NRECA itself. JA818.

NRECA's Board of Directors serves as Plan Sponsor and appoints members of the Committee, the Plan's named fiduciary. JA848. The Committee is responsible for, among other things, overseeing the administration of the Plan, monitoring service providers, and approving the Plan's annual budgets. JA848-850. NRECA is responsible for the Plan's day-to-day administration. JA847-848. The Plan paid more than $100 million in fees to NRECA for its administrative services. JA796.

Plaintiffs participated in the Plan during the class period and were allocated a portion of the administrative fees NRECA charged the Plan. Plaintiffs contend that Defendants breached their fiduciary duties to the Plan by failing to independently monitor NRECA's compensation and allowing it to receive unreasonable

compensation from Plan assets, and that NRECA engaged in prohibited transactions. JA75-76, JA83-91.

## II. The Plan's Administrative Fee Structure

### A. NRECA Contracted with and Billed the Plan, not Individual Participants

Defendants' sequence for charging the Plan for NRECA's administrative services is straightforward. NRECA provides administrative services under one Administrative Services Agreement with the Plan itself. JA713. Under that agreement, the Plan retained NRECA to provide services necessary to establish and administer the Plan. JA713.

NRECA then establishes its administrative budgets on a Plan-wide, forward-looking basis. For example, NRECA sought approval of a [redacted] *See* JA1366-1367, JA1375-1376. The same materials expressed the Plan's administrative expenses as [redacted]. JA1376. The fiduciaries and their consultants likewise evaluated total and administrative fees using Plan-wide per-participant and basis-point measures. *See* JA835, JA881, JA1385.

NRECA then bills the Plan for its administrative services on an aggregate basis. It generally submits billing packages three times per year, with each package covering four months of expenses. JA694-696. For example, one payment directive

instructed the Plan's trustee to pay [redacted] in administrative expenses for a single billing period. JA1389-1390. Those expenses are then allocated across the Plan's investment funds; they are not billed to individual participants based on the services each participant uses. JA1387-1392.

### B. The Plan Used a Common Service and Fee Structure

Defendants' own "expert", Steven Gissiner, confirms administrative fees paid from Plan assets are determined through a common, Plan-level process. He concedes that "NRECA provides ***the same*** menu of administrative and recordkeeping services to all participating cooperatives and subgroups"; "NRECA offers ***a uniform*** core menu of investment options for all participating cooperatives and subgroups"; "***the same*** [Personal Investment & Retirement Consulting] services are available to all cooperatives"; "all cooperatives are charged ***the same*** asset-based administrative and recordkeeping fees on the same investment options"; and the Plan "imposes ***the same*** asset based fee across all participating employers." *See* JA1039, JA1041-1042, JA1046, JA1050, JA1055-1057.

Apart from a $10 monthly fee for a self-directed brokerage account that is not at issue in this case, the Plan does not calculate the amount of NRECA's fees allocated to participants based on their use of optional services. JA1029-1030. It instead charges for administrative services through the expense ratios of participants' selected investments. JA1029-1030. Although the expense ratios vary

slightly between investment options, ***the same expense ratio*** applies within each option regardless of the participant's employer, service use, or account balance. JA1039, JA1055-1057, JA1387-1392. In other words, Plan participants who invest in the same fund are allocated a portion of NRECA's fee using the same percentage, regardless of which cooperative employed them, what services they use, how much they invest, or the balance in their account. The same is true for every fund in which participants invest.

### C. Plaintiffs Challenge the Plan-wide Process Used to Approve NRECA's Compensation

Defendants characterize NRECA's compensation as reimbursement "at cost" and point to reviews conducted by the Committee, Newport Trust, Callan, and Calibre. Defendants' Br. 10-13. However, Plaintiffs provided the district court with evidence revealing that the fiduciary process did not independently or adequately evaluate NRECA's administrative fees or the prudence of retaining NRECA. JA762-770, JA1221-1222. For example, in 2021, Newport reported that at [redacted] JA882, *see also* JA1247, JA1385. Based on that finding, Callan had originally [redacted] JA949. [redacted] *See* JA936-937, *see also* JA876-891.

Then, in 2023, [redacted] JA824. [redacted] JA835.

Plaintiffs also adduced evidence, provided to the district court, that [redacted]. That process included: (1) [redacted][1]; (2) [redacted][2]; (3) [redacted][3]; and (4) [redacted][4]

Additionally, Callan testified that NRECA provided more feedback than

---

[1] JA1242-1281, JA1283-1313, JA416-418.

[2] JA921-923, JA367-411, JA425-433, JA435-441, JA444-446 (Satisfaction tab), JA448-466.

[3] JA914-923, JA925, JA240-245, JA1242-1281, JA1315-1325, JA468-469, JA471-473, JA475-478, JA480-483, JA485-489.

[4] JA365-366, JA412-415, JA1316-1317.

Callan typically received from its other clients. JA419-420. Indeed, the final benchmarking reports were revised to include nearly all NRECA's requested revisions. JA240-245, JA1327-1331, JA1333-1335, JA491-493. [redacted]. JA820-821, JA879-882. These studies, recommendations, and decisions concerned NRECA's compensation for administering the Plan as a whole.

### D. Plaintiffs' Experts Evaluated the Plan's Fiduciary Process and Administrative Expenses

Plaintiffs' experts addressed two related questions concerning the Plan's administrative expenses. David Donaldson evaluated whether the fiduciaries used a prudent process to monitor and control administrative costs. JA839-840, JA852-868. James Scheinberg evaluated whether the Plan's administrative costs exceeded market levels achieved by similarly structured association-based multiple-employer plans. JA792-804.

Scheinberg calculated per-participant administrative costs for ten comparator plans using information reported on their Forms 5500. JA796-799. The median cost among those plans ranged from approximately $128 to $145 per participant between 2020 and 2024. JA799. Importantly, Scheinberg did not use the comparator median as a threshold separating "injured" from "uninjured" participants. He compared the Plan's administrative expenses to those of similarly structured association-based plans to estimate what it reasonably should have cost to administer this Plan. The

relevant comparison is thus between the reasonable cost of administering the Plan and what the Plan actually paid NRECA—not between the comparator median and the dollar amount allocated to each participant's account. If the Plan paid excessive administrative costs, each account from which those costs were collected bore a portion of the excess, even if the participant's annual charge fell below the comparator median. Whether that methodology ultimately proves an excessive Plan-level payment is a merits question, but it is a common one.

## III. The District Court's Certification Process

### A. The District Court Granted Class Certification After Thoroughly Considering the Parties' Arguments and Evidence

On January 29, 2026, Plaintiffs moved to certify a class under Rule 23(b)(1). JA750-786. Defendants opposed, raising the same principal arguments they advance here: participant fees varied; many fell below the comparator median; account balances, service use, and cooperatives differed; and participant disclosures supported their actual knowledge defense. JA961-964, JA966-980. Plaintiffs replied, arguing that these alleged issues did not undermine Plaintiffs' showing of commonality, typicality, adequacy, or standing. JA1228-1233, JA1236-1238. The resulting certification record spanned hundreds of pages and included numerous expert reports, an extensive evidentiary record, deposition testimony, and Plan documents.

The district court held a certification hearing on March 6, 2026. After hearing argument, the court stated that the parties had submitted "an enormous amount of information" and that "the Court ha[d] reviewed it." JA30-31. The court then found that Plaintiffs had established Article III standing and satisfied Rule 23(a), and it initially certified the class under Rule 23(b)(1). JA31, JA34-35.

### B. The District Court Vacated Its Initial Certification Order and Ordered Supplemental Briefing after *Trauernicht*

Four days later, this Court issued *Trauernicht*. *Trauernicht* involved claims that a plan sponsor breached its fiduciary duties by selecting and retaining imprudent investments. *Trauernicht*, 169 F.4th at 462-63. Whether a participant's account sustained a loss, and the amount of any loss, depended on how much the participant invested in the challenged fund, how long the investment was held, and the timing of the participant's purchases and sales. *Id.* at 468-69, 474. The appeal presented two issues: (1) whether the plaintiffs' individualized monetary claims could be certified as a mandatory class under Rule 23(b)(1); and (2) whether the district court's stated reliance on the inherent commonality of § 502(a)(2) claims constituted a "rigorous analysis" of commonality. *Id.* at 469-74.

Recognizing the relevance of *Trauernicht*, the district court *sua sponte* ordered supplemental briefing addressing that decision and the availability of certification under Rules 23(b)(2) and (b)(3). JA533. Defendants then filed an

emergency motion to vacate the March 6 certification order, which the district court granted after briefing. JA535-544.

### C. The District Court Granted Certification under Rule 23(b)(3) After Fully Considering the Expanded Record and Holding a Second Hearing

Per the district court's order, the parties submitted another round of briefing, supported by additional record evidence, addressing *Trauernicht*'s impact on certification and the viability of certification under Rule 23(b)(3). JA545-607, JA1336-1360.

The district court held a second certification hearing on May 1, 2026. The parties addressed *Trauernicht*, its impact on class certification in this case, and their competing views of the challenged Plan administrative fees. *See generally* JA36-64. Plaintiffs expressly addressed predominance, arguing that liability would turn on common proof concerning one fiduciary process and one fee structure. JA46. Plaintiffs also explained the sequence by which the fees were imposed: NRECA charged the Plan under an Administrative Services Agreement, the budgets were set at the Plan level, and the resulting expenses were then allocated among participant accounts. JA46. Critically, "[n]o individual participants negotiated their own fee, nor could any of them avoid the fee." JA46. Plaintiffs maintained that differences in the amounts charged presented an issue of allocation rather than individualized liability. JA46. Defendants argued that injury must be considered separately from breach.

JA56. They emphasized that participants paid different amounts, challenged Scheinberg's reliance on average per-participant costs, and noted that administrative fee rates varied across investment options. JA56-59.

Plaintiffs' counsel also addressed the district court's thorough commonality analysis. JA47. As counsel noted, the court did not "short circuit the commonality analysis . . . by simply saying all ERISA claims are common." JA47. Plaintiffs' counsel reiterated what they already demonstrated:

> that every element of plaintiffs' claims presents a common question: Were defendants acting as fiduciaries, did they utilize a prudent process, were the administrative fees they charged excessive, were the charging of those fees a breach of duties?

JA47-48. As counsel argued, these common questions underpin and drive resolution of the case. JA48.

The district court went on to question Defendants' contention that *Trauernicht* fit the facts and nature of the claims in this case. It observed that *Trauernicht* concerned investment performance, while this case concerned administrative fees that did not depend on "the vagaries of the market." JA55-56. Defendants' counsel's response was no different than the argument Defendants earlier made in March and, therefore, the district court asked if Defendants' counsel had anything new to add to the record. JA59. Defendants' counsel admitted "the facts are the same" but claimed *Trauernicht* changed their legal significance. JA59-60.

Following the hearing, the district court declined to recertify the class under Rule 23(b)(1). It concluded that, after *Trauernicht*, certification of a mandatory, non-opt-out class was inappropriate without further guidance from this Court. JA60-61. The district court then turned to Rule 23(b)(3). It stated that it had "looked carefully at the pleadings," "considered the issues," and took NRECA's commonality arguments "seriously." JA61. It then held that *Trauernicht* did not change its prior commonality conclusion. JA61. Its conclusion was "not based on a blanket view that in every excessive fees case or in every ERISA case there's commonality," but on "the specific allegations here regarding excessive fees determined at the plan level." JA61.

The court viewed NRECA's arguments about differences among participants as "essentially an issue of the allocation of damages, not the resolution of the legal issue as to whether or not there's been a breach of fiduciary duties based on excessive fees." JA61. The district court acknowledged that the individualized investment decisions in *Trauernicht* presented "a different circumstance" that could preclude common resolution. JA61-62. But the district court found "this particular circumstance" different because "the fees are determined at the plan level and then flow downwards to all of the participants." JA62.

The court therefore certified the class under Rule 23(b)(3). JA62, JA71-72. The certified class consists of "[a]ll participants and beneficiaries of the [NRECA]

401(k) Pension Plan who were charged administrative fees from August 1, 2020, through the date of judgment." JA71.

## SUMMARY OF ARGUMENT

I. The record refutes Defendants' claim that the district court failed to conduct a rigorous analysis.

A. After extensive briefing, evidence, and a hearing, the court initially certified the Class under Rule 23(b)(1). Four days later, this Court decided *Trauernicht*. The district court then ordered supplemental briefing, vacated its initial certification order, held a second hearing, and certified the Class under Rule 23(b)(3). In doing so, it rejected any blanket presumption that ERISA claims are common. It identified the Plan-level determination of NRECA's administrative fees as the central common issue, distinguished *Trauernicht*, and treated Defendants' participant-level differences as matters of allocation.

B. The district court's reasoning was concise, but clear and provided the level of detail necessary for appellate review. However, if further explanation is required, the proper remedy is remand, not reversal.

II. The district court did not abuse its discretion in finding commonality and predominance.

A. Plaintiffs' claims turn on two common questions: whether Defendants used a prudent process to evaluate NRECA's administrative fees and whether that

process caused the Plan to pay excessive fees. Both questions can be answered using a single Administrative Services Agreement with the Plan, Plan-wide budgets and invoices, fiduciary records, and expert evidence. NRECA contracted with and billed the Plan, not individual participants. Defendants' own expert confirmed that NRECA provided the same menu of administrative and recordkeeping services and charged the same asset-based fees on the same investment options across all participating employers. The expenses were then allocated among participant accounts. Account balances and investments may affect the amount allocated, but not the fiduciary process or whether the Plan paid excessive administrative fees.

That distinguishes this case from *Trauernicht*. There, injury depended on individual investment decisions, and the same investment could benefit one participant and harm another. Here, no participant selected NRECA, negotiated its fees, or could avoid them while remaining in the Plan. If common evidence proves that Defendants' process caused the Plan to pay excessive administrative fees, every Class member bore a portion of that excess.

B. Defendants' remaining predominance arguments do not alter that conclusion. Scheinberg used the comparator median to estimate the reasonable cost of administering the Plan and the amount by which its actual fees exceeded that cost, not as an individual injury threshold. Challenges to his methodology present a common merits dispute. Any resulting Plan loss can then be allocated using Plan

records. *Intravaia* provides a concrete example: recovery on similar claims involving this Plan was allocated based on participants' account balances and investments.

C. The limitations defense likewise does not require individualized adjudication on this record. The uniform participant disclosures did not reveal how much NRECA charged the Plan or how its fees were calculated or approved.

III.A-B. The district court reasonably found typicality and adequacy satisfied. Mullins and Sunderlin challenge the same alleged breaches, rely on the same proof, and seek the same relief as the Class.

C. Defendants' asserted conflicts depend on fee structures Plaintiffs do not seek and speculative service reductions NRECA has never proposed. Those possibilities do not create a fundamental conflict.

IV. Mullins and Sunderlin established Article III standing. Defendants' own expert calculated the administrative fees charged to their accounts. If Defendants' alleged fiduciary breaches caused the Plan to pay excessive administrative fees, those breaches increased the amounts deducted from Plaintiffs' accounts. Restoration of the resulting Plan loss would redress that injury. *Peters* also supports their standing to seek disgorgement.

## **STANDARD OF REVIEW**

Plaintiffs do not contest Defendants' Standard of Review statement.

# ARGUMENT

## I. The District Court Rigorously Analyzed Rule 23

### A. The Full Certification Record Shows the District Court's Rule 23 Analysis

Defendants' argument rests on a false premise that the brevity of the district court's certification order necessarily demonstrates the absence of the "rigorous analysis" required by Rule 23. That is not the law. Courts speak through the entirety of the record, not through the length of a written order.

The Supreme Court has cautioned that "[w]e do not, of course, judge the propriety of a class certification by hindsight." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). The relevant question is whether the district court is satisfied that the proposed class meets the requirements of Rule 23(a) and the applicable subsection of Rule 23(b). *Id.* at 161; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004). In this regard, Rule 23 requires a "rigorous analysis" of, or a "close look" at, Rule 23's prerequisites. *Gariety*, 368 F.3d at 365. "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160; *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 357-58 (4th Cir. 2014).

District courts retain "broad discretion in deciding whether to certify a class" because of "the considerable advantages that our district court colleagues possess in managing complex litigation." *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 929 (4th Cir. 2025) (citations omitted). Here, the certification proceedings bear no resemblance to the cursory process Defendants describe. Nor did the district court merely focus on Plaintiffs' allegations. Defendants' Br. at 33. As detailed above, the district court considered two rounds of certification briefing, an extensive evidentiary record, and two hearings before certifying the class under Rule 23(b)(3). *See supra* 11-16. The court also repeatedly confirmed that it reviewed the parties' submissions and considered the disputed issues. JA20, JA30-31, JA61.

Critically, the court engaged with the substance of the parties' arguments. Defendants characterize the district court's discussion of commonality as a single sentence and accuse it of refusing to follow *Trauernicht*. Defendants' Br. 31-32. But Defendants' argument begins at the end of the court's analysis. As explained above, the district court questioned Defendants' comparison to *Trauernicht* and explained that its ruling rested on "the specific allegations here regarding excessive fees determined at the plan level," not a categorical presumption of commonality in ERISA cases. *See supra* 14.

Defendants separately contend that the court offered "no analysis" of predominance because its oral ruling did not use that word. Defendants' Br. 30-31.

That argument mistakes terminology for substance. The parties' supplemental proceedings centered on the viability of certification under Rule 23(b)(3), and the parties specifically briefed predominance. JA565-568, JA600-603, JA1352-1357. Plaintiffs began the May 1 hearing by expressly addressing why common questions concerning the Plan-level fiduciary process and fee structure predominate, how they resulted in excessive administrative fee allocations for all participants, and how those common questions would drive the litigation. JA46. Defendants similarly began their oral argument "with (b)(3)" which they acknowledged "the Court is most thinking about."[5] JA51.

The structure of the district court's ruling confirms that it carefully considered predominance. It began by stating that it was "left with making that evaluation under (b)(3)." JA60-61. It then addressed the participant-level differences identified by Defendants and concluded that they concerned "the allocation of damages" rather than resolution of the alleged fiduciary breach, and found that "superiority is not an issue." JA61. The court went on to state:

> I appreciate the arguments that there's a difference between IRAs and contribution plans where people are making individualized decisions, and certainly in *Trauernicht* the Fourth Circuit has made clear that that's a different circumstance in evaluating how people make those decisions, and that there may not be the same sort of commonality or ability to resolve it this way. But in this particular circumstance, given the way the fees are determined at the plan level and then flow

[5] Although Defendants' counsel argued 23(b)(3) (*i.e.* predominance and superiority), they chose to use the word "commonality." JA51.

> downwards to all of the participants, the allocation issue can be addressed.

JA61-62. Then the court held that certification under Rule 23(b)(3) was appropriate. JA62.

That analysis addressed the substance of predominance. The district court concluded that participant-level differences concerned the allocation of damages, not resolution of the common question of whether Defendants breached their fiduciary duties by causing the Plan to pay excessive fees. Its use of the term "commonality" appears to be an error in diction, not a lack of analysis.

The record also shows that the district court carefully considered standing. The parties briefed the alleged injuries to Mullins, Sunderlin, and the class and argued the issue at the March hearing. JA774-775, JA966-969, JA1225-1228, JA21-24, JA26-30, JA604-605, JA1358-1359. After confirming that it had carefully reviewed the parties' materials, the court ruled for Plaintiffs on Article III standing. JA20, JA30-31. Defendants may disagree with that ruling, but disagreement with the result does not establish an absence of analysis.

The same is true of typicality and adequacy. The parties' briefing addressed Defendants' asserted differences between Plaintiffs and other class members, as well as the alleged conflicts within the class. JA778-783, JA974-978, JA1234-1237, JA604-605, JA1358-1359. The parties also argued those issues at the March hearing.

JA25-26, JA28-30. The court reviewed those submissions and found that the requirements of Rule 23(a) were satisfied. JA20, JA30-31.

That treatment was sufficient. Commonality, typicality, and adequacy "tend to merge." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998). Applying that principle, this Court concluded in *1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Insurance Co.* that, after resolving commonality, it "need not tarry for long" over typicality. 28 F.4th 513, 523 (4th Cir. 2022). Here, Defendants relied on the same alleged differences among class members to contest commonality, typicality, and adequacy. JA970-978, JA28-30. Once the district court rejected those differences as a basis for individualized adjudication, it was not required to repeat the same reasoning under each overlapping requirement.

Before concluding the second hearing, the court asked whether there was "anything else [it] need[ed] to address with regard to this matter[.]" JA63. Defendants' counsel remained silent; they did not suggest the court overlooked any argument or evidence, or that its analysis was insufficient. JA63. For the reasons explained above, the district court considered the parties' arguments and evidence, revisited certification after *Trauernicht*, and explained its Rule 23(b)(3) ruling. Defendants' disagreement with that reasoning does not establish an abuse of discretion.

### B. Considering the Entire Record, the District Court Did Not Abuse Its Discretion by Issuing a Succinct Order

Defendants treat the written order's brevity and the oral ruling's terminology as proof that no rigorous analysis occurred. Defendants' Br. at 30-35. But the written order, the court's oral ruling, and certification record make the court's reasoning clear: participant-level differences concern the allocation of damages, not resolution of the common question of whether Defendants breached their fiduciary duties by causing the Plan to pay excessive fees. *See supra* 11-16.

Defendants effectively ask this Court to adopt a per se rule that a concise certification order is itself reversible error whenever it does not expressly discuss every Rule 23 element in detail. Neither Rule 23 nor legal precedents support such a requirement. *Shahriar* is instructive. There, the Second Circuit explained that a district court need not "utilize any particular verbal formula" or "make express findings on each requirement." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251-52 (2d Cir. 2011). Where the basis for certification is apparent from context, a court should not reverse merely because the district court did not expressly recite each finding. *Id.* at 252. Applying that principle, the Second Circuit examined the record and certification hearing transcript and affirmed. *Id.* at 252-53; *cf. Oliver v. Navy Fed. Credit Union*, 167 F.4th 106, 114 (4th Cir. 2026) (examining the district court's oral and written rulings in context to determine which Rule 23 requirements the court had addressed).

The decision in *Chamberlan v. Ford Motor Co.* to deny a Rule 23(f) petition is persuasive for the same reason. 402 F.3d 952, 961-62 (9th Cir. 2005). There, the Ninth Circuit rejected Ford's characterization of the predominance analysis as a single sentence because that sentence contained six distinct substantive examples. *Id*. Defendants' characterization here is similarly incomplete. The district court rejected any blanket presumption of commonality, identified the Plan-level determination of fees as the common issue, distinguished *Trauernicht*, concluded that participant-level differences concerned the allocation of damages rather than resolution of the common question, and found superiority satisfied. *See supra* 15-16. Its reasoning was concise but not conclusory. As in *Chamberlan*, requiring more would produce "nothing more than a lengthy explanation of the obvious." *Id.* at 962.

Defendants' authorities do not compel a different result. In *Ealy*, this Court could not identify any meaningful commonality or typicality analysis, could not determine whether the district court had conducted a distinct predominance analysis, and found no analysis of superiority. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 Fed. App'x 299, 306-08 (4th Cir. 2013). *Ealy* therefore involved missing analyses, not merely a concise explanation of discernible reasoning. Here, the written order expressly stated that the Class satisfied each Rule 23(a) requirement, predominance, and superiority "for the reasons stated in open court." JA71; *see also supra* 15-16.

*Target* likewise involved absent, not abbreviated, analysis. *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612-13 (8th Cir. 2017). After preliminarily certifying a settlement class without objections or adversarial briefing on adequacy, the district court refused to consider a purported intraclass conflict raised by an objector because certification had already occurred. *Id* at 613. Here, by contrast, the district court reconsidered certification after *Trauernicht* through supplemental briefing and a second hearing and explained its Rule 23(b)(3) decision. *See supra* 13-16.

*Chavez* likewise turned on missing analysis. *Chavez v. Plan Benefit Services, Inc.*, 957 F.3d 542, 545, 548-49 (5th Cir. 2020). The order contained "about five pages of substantive analysis." *Id.* at 545. But the proposed class spanned at least 1,700 separate plans, and the parties disputed whether variations in their fees, structure, and assignment of responsibility prevented the defendant's fiduciary status from being determined classwide. *Id.* at 545 and n.1, 548-49. The district court did not analyze the impact of that dispute, specifically identify a common question, or explain how answering it would resolve an issue central to the class claims in one stroke. *Id.* at 548-549. It offered only an "unsupported assurance" that fiduciary status was capable of classwide resolution. *Id.* at 549.

Those asserted variations across at least 1,700 separate plans are not present here. This case concerns one Plan, and NRECA executed the ASA with that Plan,

not with participating cooperatives, subgroups, or individual participants. *See supra* 5-7. The district court here specifically identified the common question as whether Defendants breached their fiduciary duties by causing the Plan to pay excessive fees. JA61. It concluded that the participant-level differences on which NRECA relied concerned "the allocation of damages," not resolution of that common question, because the fees were "determined at the plan level" and then "flow[ed] downwards to all of the participants." JA61-62.[6]

Nevertheless, even if this Court concludes that the district court did not adequately articulate the required Rule 23 analysis, Defendants seek the wrong remedy. They contend that the district court failed to conduct a rigorous analysis yet ask this Court to decide the Rule 23 requirements against the Class in the first instance rather than remand for the very analysis they claim is missing.

In *Gariety*, this Court held that because the district court had "failed to look beyond the pleadings and conduct a rigorous analysis," it "must remand the case to permit the district court to conduct the analysis and make the findings required by

---

[6] *Chavez* also observed that, "the rigor requirement does not turn on how much material the parties submit or on how carefully the court seems to weigh the issues at a hearing. It instead asks whether the court's order sufficiently analyzes Rule 23." 957 F.3d at 551. But that principle does not help Defendants here. The district court's reasoning here appears in the oral ruling, which is expressly incorporated into its written order. JA71. As argued *supra*, the surrounding briefing, evidence, and argument provide context for understanding that reasoning; they do not supply reasons the district court never gave.

Rule 23(b)(3)." 368 F.3d at 367. *Ealy* likewise declined to decide whether certification ultimately was proper after finding the district court's analysis inadequate. It made "no determination" whether a class, subclasses, or even whether no class should be certified and remanded "for the required rigorous analysis." 514 Fed. App'x at 308, 311. Appellants' remaining authorities followed the same course. *Target* remanded for the district court to "conduct and articulate a rigorous analysis," 847 F.3d at 615, and *Chavez* vacated while "express[ing] no view on whether a class should be certified," 957 F.3d at 551. If this Court finds the district court's explanation inadequate, it should do the same.

## II. The District Court Did Not Abuse Its Discretion in Finding that the Class Satisfies Commonality and Predominance

Defendants repeatedly argue that class members did not suffer the "same injury" and thus the court abused its discretion in finding commonality satisfied. However, the relevant legal standard is whether class members' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. When the facts are considered against that standard, it is clear the court did not abuse its discretion.

Defendants go on to predict the need for "100,000 individualized showings of concrete injury" to establish Article III standing and that Defendants' actual knowledge defense will defeat commonality and predominance. Defendants' Br. 36-49. But those participant-specific facts do not make the common questions incapable

of class resolution or show that the district court's certification decision fell outside its discretion.

The record here presents two common questions: whether Defendants' fiduciary process was prudent and whether that process caused the Plan to pay excessive administrative fees. Plaintiffs will answer each question once using the same evidence: the Plan's Administrative Services Agreement, Plan-wide budgets and invoices, fiduciary records, and expert evidence. *See supra* 5-11. Account balance, investment selection, and timing may affect the amount of the Plan's administrative expenses allocated to each participant's account. But they do not change the fiduciary process used to establish those fees or whether those fees were excessive. On this record, the court acted within its discretion in concluding that those common questions predominate.

### A. The District Court Reasonably Found that the Alleged Injury is Common to the Class

#### i. The District Court Reasonably Distinguished *Trauernicht*

Rule 23 does not require class members to have suffered identical damages. *See, e.g.*, *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device . . . to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined . . . the fact that damages are not identical across all class

members should not preclude class certification."). Nor does *Trauernicht* hold that all claims involving defined contribution plans are inherently individualized. *Trauernicht* makes clear that the inquiry begins with "the nature of the plaintiffs' claims" and the circumstances that determine whether the injury occurred. *Trauernicht*, 169 F.4th at 467, 473-74. The district court reasonably applied that claim-specific inquiry here.

Defendants skip that threshold inquiry. They instead seize on *Trauernicht*'s description of § 502(a)(2) claims involving defined contribution plans as "individualized monetary claims" and treat it as a categorical answer to commonality in every such case. Defendants' Br. 36. But this Court used that description while explaining why ***the claims before it*** could not be joined in a mandatory class under Rule 23(b)(1).[7] *Trauernicht*, 169 F.4th at 472. Indeed, this Court framed its holding in terms of "the plaintiffs" claims and emphasized that "***the plaintiffs' and purported class members'*** individual circumstances differed dramatically." *Id.* at 463 (emphasis added). It did not hold that commonality and predominance fail whenever a defined contribution plan is involved.[8]

---

[7] *Trauernicht* is a context-specific decision, as this Court noted. *Trauernicht*, 169 F. 4th at 467 ("We begin ***with the nature of the plaintiffs' claims*** in order to determine whether they can be certified as a class action under Rule 23(b)(1).") (emphasis added).

[8] Appellants read *Trauernicht* far too broadly. Even Genworth recognized that the panel "did not make a sweeping pronouncement that § 502(a)(2) defined-contribution claims are 'uncertifiable.'" *Trauernicht v. Genworth Financial, Inc.*,

The facts of *Trauernicht* explain why commonality failed there. Injury depended on each participant's investment decisions. Participants selected different funds, invested different amounts, and bought and sold under different market conditions. *Id.* at 465-69, 474. For example, a participant who bought the challenged investment after its price fell and sold after it rose could benefit from its retention. *Id.* at 468-69. But a participant who bought before a decline and sold before a recovery could lose money. *Id.* The same challenged investment could therefore benefit one participant's account while injuring another.

No comparable participant choice determines whether a Plan participant here was overcharged. It was NRECA that contracted with the Plan under the Administrative Services Agreement, and the Plan's fiduciaries approved the Plan-wide budgets. *See supra* 5-6. NRECA then billed the Plan in the aggregate for its administrative costs. *Id.* at 6-7. Only after those Plan-level decisions were the resulting expenses allocated to participants based on their account balances and fund selections. *Id.* at 7. No participant individually selected NRECA, negotiated the cost of its administrative services, approved its budget, or could avoid the administrative fees while remaining in the Plan.

---

No. 24-1880, Dkt. 91 at 21 (4th Cir. Apr. 27, 2026). In opposing rehearing en banc, Genworth explained that the panel's "commonality analysis rested on ***case-specific*** considerations, was ***narrow***, and aligned with precedent." *Id.* at 20 (emphasis added); *see also id.* at 21 ("Rejecting an 'overgeneralized approach' to commonality, the panel instead reversed for highly case-specific reasons.").

The class definition reflects that distinction. The Class here is limited to participants who were charged Plan administrative fees. JA71-72. If Plaintiffs prove that an imprudent fiduciary process caused the Plan to pay excessive administrative fees, every class member's account was charged more than it would have been had the fiduciary acted prudently. Account balance, investment selection, timing, and expense ratios may affect the amount of the overcharge, but not whether an overcharge occurred. The district court therefore acted within its discretion in treating those differences as allocation issues rather than barriers to commonality.

Differences in cooperative size and service use also do not change the nature of the alleged injury. NRECA offered the same menu of administrative and recordkeeping services, a uniform core menu of investment options, and the same investment consulting services across all participating employers. *See supra* 7-8. It also charged the same expense ratio within each investment option regardless of the participant's employer. *Id.* Apart from the self-directed brokerage fee, participants were not separately charged based on which optional services they used. JA1029-1030. So, Defendants' contention that smaller cooperatives received more "value" has no bearing on the amount individual participants were allocated. Defendants' Br. 42-43. That contention presents a common merits question, not an individualized question of injury.

*Spurlock v. Wexford Health Sources, Inc.*, confirms the distinction between injury and the degree of resulting harm. 175 F.4th 232, 248 (4th Cir. 2026). There, the defendant argued that liability turned on the symptoms each class member experienced after being denied medical care for opioid use disorder and subjected to withdrawal. *Id.* This Court held that the argument "misinterpret[ed] the alleged constitutional injury." *Id.* The injury was the denial of medical care for a medical need and the resulting harm of withdrawal contrary to prevailing standards of care, not any particular withdrawal symptom. *Id.* These differences were not significant enough to defeat predominance. *Id.* This Court also upheld the district court's finding that an economic damages model based on the number of days each class member was denied adequate medical care was sufficiently linked to that same theory of liability. *Id.* at 249-250.

Defendants make the same error here by equating a smaller loss with no injury. As Defendants previously suggested, an apprentice lineman who paid $5 in administrative fees "doesn't have injury." JA27-29. But under Plaintiffs' theory, if a prudent fiduciary process would have resulted in a charge of $4 or less, the lineman was indisputably overcharged. JA30. The fact that this overcharge may be smaller than that of a participant with a larger account balance only impacts the amount of the loss, not whether he was overcharged. Such differences in degree do not

eliminate the alleged common injury or make the district court's commonality finding unreasonable.

### ii. Defendants' Comparator Median Argument Does Not Establish an Abuse of Discretion

Plaintiffs' expert, James Scheinberg, compared the Plan's administrative costs against ten comparable plans to estimate the reasonable market cost of administering the Plan. *See* JA788-804. For each year, he identified the median per-participant administrative cost among those plans. JA798-800. That figure ranged from approximately \$128 to \$145 during the class period. JA799.

| COMPARATORS | Schedule C Costs per Partic. w/ Balance less Code 28 (Investment Management) | | | | |
|---|---|---|---|---|---|
| **Plan** | **2020** | **2021** | **2022** | **2023** | **2024** |
| CREDIT UNION RETIREMENT PLAN ASSOCIATION 401(K) PLAN | \$ 239 | \$ 310 | \$ 134 | \$ 145 | \$ 160 |
| ENGAGE PEO RETIREMENT SAVINGS PLAN | \$ 113 | \$ 120 | \$ 103 | \$ 100 | \$ 116 |
| EXTENSIS GROUP RETIREMENT SAVINGS PLAN | \$ 215 | \$ 249 | \$ 81 | \$ 87 | \$ 141 |
| G & A PARTNERS MULTIPLE EMPLOYER 401(K) PLAN | \$ 222 | \$ 300 | \$ 260 | \$ 161 | \$ 176 |
| OASIS RETIREMENT SAVINGS PLAN | \$ 111 | \$ 114 | \$ 105 | \$ 113 | \$ 121 |
| PACIFIC DENTAL SERVICES, LLC 401(K) PLAN | \$ 107 | \$ 99 | \$ 69 | \$ 73 | \$ 85 |
| QUESTCO COMPANIES RETIREMENT PLAN | \$ 93 | \$ 155 | \$ 163 | \$ 149 | \$ 193 |
| RETIREMENT PLAN FOR MICHIGAN CREDIT UNION EMPLOYEES 401(K) SAVINGS PLAN | \$ 156 | \$ 157 | \$ 135 | \$ 137 | \$ 131 |
| SAVINGS PLAN FOR EMPLOYEES OF NCTA AND ITS MEMBERS | \$ 143 | \$ 136 | \$ 124 | \$ 140 | \$ 148 |
| VENSURE EMPLOYER SERVICES, INC. 401(K) PROFIT SHARING PLAN | \$ 100 | \$ 121 | \$ 230 | \$ 129 | \$ 146 |
| | | | | | |
| **MEDIAN** | **\$ 128** | **\$ 145** | **\$ 129** | **\$ 133** | **\$ 143** |
| **MEAN** | **\$ 150** | **\$ 176** | **\$ 140** | **\$ 123** | **\$ 142** |

As reflected in Scheinberg's report, he used the annual medians to calculate the Plan's alleged excess administrative fees. JA800. He did not use them to determine which participants were injured. Nor do Plaintiffs claim that any administrative fee is inherently injurious. Their claim is that an imprudent fiduciary process caused the Plan to pay excessive administrative fees.

Defendants' so-called class certification expert[9], Gissiner, used the median figures for a different purpose. He compared participants' *individual* annual charges with Scheinberg's medians. JA1088-1089, JA1090. Using that comparison, he concluded that approximately half of Plan participants were not injured because they paid less than the medians. JA1052-1053. Defendants then argue that "[t]his fact alone dooms any showing of predominance or commonality." Defendants' Br. at 38. They also characterize it as "undisputed" that many class members "actually fared better in this Plan than under Plaintiffs' own comparator plans" and "therefore suffered no injury at all." *Id.* at 38-39.

This sleight-of-hand argument only works if the comparator median separates injured participants from uninjured participants. It does not. Under Plaintiffs' theory, the relevant comparison is not between a participant's annual charge and the comparator median. It is between what participants were allocated and what they would have been allocated had the Plan paid reasonable administrative fees. A participant could therefore pay less than the comparator median and still have been overcharged. Scheinberg did not opine that every charge below the median was reasonable, and Plaintiffs never advanced that theory. Defendants cannot turn their

[9] At deposition, Gissiner admitted that he has never read Rule 23, does not know whether class certification requires common evidence, and has no training or expertise in class action law. *See* JA496-498.

expert's analysis into undisputed proof that those participants suffered no injury. The district court therefore reasonably rejected Defendants' reliance on that analysis.

**iii. Defendants' Remaining Criticisms Do Not Establish an Abuse of Discretion**

Defendants first accuse Scheinberg of "flatten[ing]" the range of comparator costs "into a median-of-averages of 'approximately $128 to $145.'" Defendants' Br. 38. This is ironic given that [redacted]. *See* JA835, JA886. Regardless, Scheinberg selected the median for good reason: "it reflects pricing that is reasonably achievable in the open marketplace for plans of comparable size and complexity, without assuming best-in-class or outlier pricing." JA800.

The comparator data also clustered around the median. In 2024, all but two comparators were within 25% of it, while the Plan's administrative and other non-investment costs were routinely more than ***200%*** of the median. JA800. Defendants may challenge whether the median provides the best benchmark. But that question turns on common expert evidence, not the circumstances of individual participants.

Defendants next rely on a different metric. They argue that "[m]ore than 99% of participants paid a *lower* percentage of their account assets than the Scheinberg comparators." Defendants' Br. 38 (emphasis in original). But that misleading comparison substitutes a percentage-of-assets measure for Scheinberg's per-

participant measure. Scheinberg explained that, for large association-based multiple employer plans like the Plan, administrative workload is driven primarily by participant count rather than asset size. JA800. [redacted]. *Supra* 8-11. The district court could reasonably conclude that whether per-participant cost or percentage of assets provides the better market benchmark will be resolved once for the class using common evidence.

Defendants' tiered-pricing argument likewise challenges Scheinberg's choice of comparators. Defendants' Br. 39-42. Several comparator plans varied their asset-based rates according to the assets attributable to each participating employer. Defendants posit that participants whose employers had larger pools of Plan assets might have paid lower rates under those plans, while participants whose employers had smaller pools of Plan assets might have paid higher rates. *Id.* at 40-41. But that is not the comparison Scheinberg made. He does not place each class member into a comparator plan and recreate a hypothetical charge under that plan's fee schedule. He uses comparator plans as market evidence of the reasonable cost of administering a plan of this size, structure, and complexity. Whether their tiered pricing structures make those plans appropriate comparators is a question for the fact finder. But the answer will not vary by class member. And because the answer will not vary by class member, the dispute itself does not give rise to an abuse of discretion finding.

Defendants similarly argue that some comparator plans charged separate transaction fees for services such as obtaining a loan, while the NRECA Plan generally included those services within its asset-based administrative fees. Defendants' Br. 41-43. That difference may affect the weight given to a comparator or the appropriateness of an adjustment. But Scheinberg does not calculate what each participant would have paid under each comparator plan based on the participant's transaction history. Separate transaction fees therefore present another common question about the comparability of the plans, not an individualized question of injury. As such, the district court could reasonably treat that issue as common as well.

**iv. Defendants' Averaging Cases Do Not Establish an Abuse of Discretion**

Defendants' four averaging cases, three of which arose in the antitrust context, do not support their categorical attack on Scheinberg's methodology. For example, the plaintiffs in *In re Lamictal Direct Purchaser Antitrust Litig.* relied on an expert model to show that each purchaser paid more than it would have paid for the drug in a competitive market. 957 F.3d 184, 193-94 (3d Cir. 2020). The court's concern was that averages could mask purchaser-specific outcomes because purchasers negotiated different prices, received different discounts, and were affected by non-uniform pricing responses. *Id.* Even then, the Third Circuit recognized that averages "may be acceptable where they do not mask individualized injury." *Id.* at 194.

The three district court decisions Defendants cite are similarly distinguishable. In *Anderson*, the expert used averaged prices of 565 tests to value more than 100,000 tests. *Anderson v. Lab'y Corp. of Am. Holdings*, 2023 WL 1970953, at *10-11 (M.D.N.C. Feb. 13, 2023). The court found that benchmark unreliable because the expert lacked data for more than 99% of LabCorp's tests. *Id.* In *In re Aluminum Warehousing Antitrust Litig.*, the expert assumed that every purchaser experienced the average pass-through despite different contractual arrangements, producing false positives. 336 F.R.D. 5, 62-63 (S.D.N.Y. 2020). And in *In re Pre-Filled Propane Tank Antitrust Litig.*, the expert pooled prices across retailers to calculate an average overcharge even though prices were "regularly negotiated, individually set, and highly dispersed among . . . individual retail customers." 2021 WL 5632089, *8 (W.D. Mo. Nov. 9, 2021). He also inferred a uniform 100% pass-through rate from data covering only three out of the thousands of retailers. *Id.* at *11-13.

The problem in these cases was the experts' use of averages to infer individualized injury despite material differences among services, contracts, transactions, and market conditions. Scheinberg uses comparator data for a different purpose. He estimates the reasonable cost of administering the Plan and compares that Plan-level benchmark with the Plan's actual fees to calculate the resulting excess. *See supra* 10-11. He does not use averages to estimate what any participant

was charged; Plan records establish those amounts. Nor does his analysis mask separately negotiated contracts or prices. *Id.* NRECA provided services under one agreement with the Plan, and participants did not negotiate NRECA's fees. *Id.* at 5-7. Whether Scheinberg's comparator analysis is sound will therefore rise or fall for the entire Class based on common evidence.

Plaintiffs thus did what *Trauernicht* requires. They identified the alleged injury and evidence capable of proving it classwide. If common evidence establishes that the challenged fiduciary process and alleged prohibited transactions caused the Plan to pay excessive administrative fees, the Plan's allocation mechanism passed a portion of that excess into every class member's charge. Account balances and investment selections may affect the amount of each overcharge, but not whether each charge included part of the Plan-level excess. The district court acted within its discretion in concluding that those differences do not defeat commonality or predominance.

### B. Defendants' Individualized Standing Argument Does Not Defeat Predominance

Defendants contend that determining whether each class member suffered an injury will require individualized evidence and therefore defeat predominance. Defendants' Br. 43-45. They are wrong. *Spurlock* provides the governing framework.

A district court "need not find that all of the unnamed class members possess Article III standing" before certifying a class. *Spurlock*, 175 F.4th at 251. And "[m]ere conjecture about hypothetical uninjured class members cannot defeat predominance." *Id.* at 252; *see also id.* at 251 n.7 (rejecting argument that *Alig* requires standing be established for each class member as a precondition to certification).

Under that framework, the relevant question is whether common proof will determine injury, not whether every class member paid the same amount. *Tyson Foods* confirms that predominance does not require every issue to be common. When "'one or more of the central issues in the action are common to the class and can be said to predominate,'" certification remains proper "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

Here, the district court reasonably identified the predominant common question as whether the Plan paid excessive administrative fees. Defendants concede that common Plan-level evidence could establish injury if every participant paid the same flat-dollar fee. Defendants' Br. 44. That concession confirms that common Plan-level proof can establish injury. The Plan's asset-based allocation method

affects only how much of any excess was allocated to each account, not whether the Plan was overcharged.

The evidence bearing on the predominant question is Plan-wide. Under a single Administrative Services Agreement, NRECA provided services to the Plan. *Supra* 5-6. Administrative expenses were budgeted and billed at the Plan level and then allocated across the Plan's investment funds without regard to the services individual participants used. *Id.* at 6-8. Plaintiffs' experts addressed the same Plan-level questions, opining that Defendants' fiduciary process was imprudent and that the Plan's administrative fees were excessive. *Id.* at 10-11. A finding that the Plan paid excessive fees would establish that every class member charged a portion of those fees bore a corresponding share of the Plan's loss. Account records would determine only the amount allocated to each account. Defendants' reliance on below-median charges and differing service use does not undermine this Plan-wide proof. A below-median charge does not identify an uninjured participant because the comparator median was not an individual injury threshold. *Id.* at 11, 34-36. Service use likewise does not identify an uninjured participant because NRECA did not bill participants based on the services they used. *Id.* at 6-8. This record gave the district court a reasonable basis to conclude that common questions predominate.

*Mr. Dee's* involved a materially different record. There, the plaintiffs' expert model showed no observable price increase for 32% of the class, and payment

practices varied under company-specific policies. *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 933-34 (4th Cir. 2025). Unlike *Mr. Dee's*, Plaintiffs' expert model does not identify a group of uninjured members. Nor do any account-level calculations remaining after the resolution of the common Plan-level question defeat predominance. As *Green-Cooper* reiterated, "'[i]ndividualized damages issues are of course least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Green-Cooper v. Brinker International, Inc.*, 73 F.4th 883, 893-94 (11th Cir. 2023). The Plan's account records and allocation method provide that mechanism here.

Defendants have not shown that determining injury will require approximately 100,000 mini-trials. The case requires a common determination whether the Plan paid excessive administrative fees, followed, if necessary, by mechanical account-level calculations. That does not defeat predominance.

### C. Defendants' Statute of Limitations Defense Does Not Defeat Predominance

Defendants next argue that their statute of limitations defense requires individualized inquiry into each class member's actual knowledge and therefore defeats predominance. Their authorities establish no categorical rule that statute of limitations defenses defeat predominance, and the record does not compel individualized inquiries here.

ERISA provides a six-year limitations period, shortened to three when a plaintiff has "actual knowledge" of the breach or violation. *See* 29 U.S.C. § 1113(1)-(2). Although Plaintiffs bear the burden of establishing predominance, this Court has rejected the view that "individual questions necessarily arise any time a defendant raises a statute of limitations defense." *Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311, 327 (4th Cir. 2006). Whether the defense defeats predominance instead depends on a "close look" at the facts relevant to certification. *Id.*

*Thorn* illustrates that fact-specific inquiry. There, individualized knowledge was a genuine issue because Jefferson-Pilot supported its defense with an expert report identifying "numerous sources of information" from which class members "could have become aware" of the challenged practices. *Id.* at 316. On that record, this Court concluded that the plaintiffs had "not shown" that the defense rested on "facts applicable to the entire class, *qua* class." *Id.* at 327. Defendants' remaining authorities likewise involved evidence that made the statute of limitations defense inquiry turn on class members' individual knowledge or conduct. *EQT Production Co. v. Adair*, 764 F.3d 347, 369-70 (4th Cir. 2014) (plaintiffs received royalty payments over a 20-year period, EQT produced reports disclosing deductions from those payments, and plaintiffs raised fraudulent concealment tolling in response); *Broussard*, 155 F.3d at 342 (Meineke produced evidence that it initially disclosed

the purportedly injurious payments in a 1986 audit and "several progressively more detailed annual audits.").[10]

The record here is materially different. Defendants offered no evidence that the uniform disclosures to Plan participants revealed NRECA's compensation, how it was calculated or approved, or other facts underlying Plaintiffs' claims. And they identified no other source that disclosed those facts on a classwide basis. The record instead shows that the limitations defense can be resolved through common, Plan-wide proof.

NRECA provided services to all Plan participants under the same agreement. *See supra* 5-6. Every participant received annual disclosures. JA292-295. Defendants' corporate witness confirmed that one such disclosure reflected the format typically used from 2020 through 2024. JA703. Those disclosures did not state how much NRECA charged the Plan or provide a formula for calculating the portion allocated to any participant. JA292-295, JA704-708. Participants also received 401(k) statements that did not vary among participants in the administrative

[10] Neither *Sulyma* nor *Guenther* involved class certification. They nevertheless confirm that Defendants must produce evidence that class members ***actually became aware*** of relevant facts, rather than merely showing that information was available to them. *Intel Corp. Investment Policy Committee v. Sulyma*, 589 U.S. 178, 186 (2020) (holding that "§ 1113(2) requires more than evidence of disclosure alone."); *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1055-56 (9th Cir. 2020) (defendant put forward evidence that plaintiff received a letter that contradicted defendant's earlier representation and understood it to do so). Defendants identify no comparable evidence here.

fee information they disclosed. JA292-295, JA343-344. Those statements did not disclose the amount of administrative fees that NRECA charged or a formula for how NRECA calculated those fees. JA292-295, JA343-344. This common evidence supports the district court's predominance finding despite Defendants' limitations defense.

The district court likewise was not required to infer individualized actual knowledge from the *Intravaia* settlement. Defendants' Br. at 54. Defendants offered no evidence that notice of the earlier claims actually revealed NRECA's excessive administrative fees or the fiduciary process challenged here. Nor did knowing that NRECA was an affiliated service provider reveal how much it received or how administrative fees were approved. In any event, neither Mullins nor Sunderlin recalled receiving notice of the *Intravaia* settlement. *See* JA519-520, JA528-529.

## III. Defendants' Typicality and Adequacy Arguments Do Not Show that the District Court Abused Its Discretion

Defendants contend that the district court abused its discretion by overlooking two purported intraclass conflicts. Defendants' Br. 49-57. But neither asserted conflict shows that the district court's typicality and adequacy determinations fell outside its discretion. Both depend on claims Plaintiffs did not assert and relief they do not seek. On the claims and relief actually at issue, Plaintiffs' interests are aligned with those of the class.

### A. Defendants' Speculative Intraclass Conflict Theories Do Not Establish an Abuse of Discretion

Defendants first contend that the named Plaintiffs' lower account balances place them in conflict with higher-balance participants. Defendants' Br. 51-53. According to Defendants, higher-balance participants would benefit from challenging the Plan's asset-based allocation method and seeking fixed-dollar fees, while the named Plaintiffs benefited from the existing allocation method. *Id.*

That asserted conflict rests on a mischaracterization of an opinion offered by Plaintiffs' fiduciary process exert, David Donaldson. Plaintiffs do not challenge how the Plan allocates administrative expenses among participants or seek to replace asset-based fees with fixed-dollar fees. And Donaldson did not opine that the Plan was required to use a fixed-dollar structure. He opined that the fiduciaries acted imprudently by failing to consider alternative fee methodologies. JA865-866. Considering an alternative is not the same as requiring its adoption. All class members share an interest in determining whether the fiduciaries' process caused the Plan to pay excessive fees and restoring any resulting loss to the Plan. That hypothetical divergence does not make the district court's typicality or adequacy determination unreasonable. Defendants therefore identify no actual conflict. They merely speculate that higher-balance participants might prefer to pursue a different claim seeking relief no one requests here.

Defendants next contend that participants at large and small cooperatives have conflicting interests because success in this case would supposedly cause NRECA to reduce services on which smaller cooperatives depend. Defendants' Br. 53-54. Defendants' expert, Gissiner, opined that smaller cooperatives generally rely more heavily on NRECA's administrative support than larger cooperatives with their own HR staff. JA1037-1040. But his report confirms that this is only a hollow prediction. JA1083 ("Under Plaintiffs' proposed relief, smaller cooperatives and their participants ***could face*** higher total costs or reduced services.") (emphasis added).

Gissiner's unsubstantiated prediction also conflates price with service level. Plaintiffs contend that the Plan paid more than a reasonable market price for the services it received. They do not contend that the Plan should have paid less by accepting fewer services. Consistent with that theory, Scheinberg assessed whether the Plan's administrative costs "were reasonable in light of services provided to the Plan." JA791. Gissiner identified no evidence that restoring any resulting losses to the Plan would require NRECA to cut services. JA1083-1084. His speculation about how NRECA might respond after judgment does not establish antagonistic interests within the class, much less a fundamental conflict that rendered certification an abuse of discretion.

Defendants' tiered-pricing theory is similarly speculative. Gissiner surmised that applying one comparator's tiered schedule to the Plan would generally have

increased asset-based rates for smaller subgroups and reduced them for larger ones. JA1069-1070; Defendants' Br. 54-55. Scheinberg, however, compared "the Plan's actual per-participant administrative cost" with "the median per-participant cost observed among the comparator plans" and translated the difference into "total Plan-level excess costs." JA801. He did not propose that NRECA adopt any comparator's pricing schedule, and Plaintiffs do not seek that relief. The possibility that participants might fare differently under a fee structure no one seeks is hypothetical and does not show that the district court abused its discretion.

### B. The Record Supports the District Court's Typicality Determination

Typicality requires comparing the elements of the named plaintiffs' claims and the facts needed to prove them with those of absent class members. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). The named plaintiffs' claims cannot be so different that proving them would fail to advance the class members' claims, but they need not be "perfectly identical or perfectly aligned." *Id.*; *Spurlock*, 175 F.4th at 247.

Here, the district court reasonably concluded that Plaintiffs satisfy that standard. They allege Defendants breached their fiduciary duties and caused the Plan to pay NRECA excessive administrative fees. *See supra* 5-6. The claims of absent class members arise from the same alleged breaches involving the administrative services NRECA provided to the Plan under a single ASA. *Id.* at 5-11. Plaintiffs and

absent class members rely on the same evidence concerning Defendants' fiduciary duties and the process used to approve and monitor NRECA's fees. *Id*. That evidence will determine whether those fees were reasonable and whether the Plan suffered a loss. Proof of Plaintiffs' claims will therefore advance the claims of the class.

The participant-level differences Defendants rely on do not make that finding an abuse of discretion. Account balances and investment selections affect only the amount of the Plan's administrative expenses allocated to each account and how any restored loss would be allocated among participants. They do not change the conduct challenged, the elements of the claims, or the evidence required to establish liability. This Court's decisions in *Spurlock* and *Gunnells* support that conclusion. *Spurlock* upheld the district court's typicality finding despite variations in class members' symptoms because all class members experienced the same alleged constitutional injury. 175 F.4th at 247. *Gunnells* likewise recognized that Rule 23 contains "no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427-428 (4th Cir. 2003).

*Intravaia* further supports the district court's determination. In that class action lawsuit, another group of Plan participants asserted similar allegations that NRECA charged excessive administrative fees to the Plan. *Intravaia v. NRECA*, No.

1:19-cv-00973-LO-IDD, Dkt. 113 (E.D. Va.). There, the district court certified a settlement class after finding that the class satisfied "all of the requirements of Rule 23(a) and 23(b)(1)." *Intravaia*, Dkt. 113 at 1. The approved plan of allocation provided for distributing the settlement among Plan participants based on their account balances and investments. *Intravaia*, Dkt. 95-2 at 15-20 (Article 6). *Intravaia* provides a concrete example of purported participant-level differences being addressed through the allocation of recovery.

Defendants cite *Broussard*, but that case involved materially different claims and proof. Class members had different contracts, representations, reliance, and tolling issues, and their lost profits claims required individualized proof based on each franchise's business circumstances. *Broussard*, 155 F.3d at 340, 342-43. Here, all claims arise from the same alleged fiduciary breaches. No participant-specific proof is required to determine Defendants' liability or the Plan's loss. *Broussard* therefore does not show that the district court's typicality finding fell outside its discretion.

*Deiter* is similarly distinguishable. There, the plaintiffs purchased software at retail prices, while enterprise purchasers negotiated unique prices in a different market, creating a "substantial gap" in the proof of their claims. 436 F.3d at 467-68. Here, no participant contracted or negotiated separately with NRECA. All claims arise from the same Plan, agreement, and alleged fiduciary breaches. The evidentiary

gap in *Deiter* is absent here. The district court therefore had a reasonable basis to find typicality satisfied.

### C. The Record Supports the District Court's Adequacy Determination

"For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells*, 348 F.3d at 430). "A conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants.'" *Id.* (quoting *Gunnells*, 348 F.3d at 431).

The record likewise supports the district court's adequacy determination. Mullins and Sunderlin's interests are aligned with those of the class. The certified claims challenge the same alleged fiduciary breaches and seek restoration of any resulting Plan loss for proportional allocation among affected participants. As explained above, Defendants' contrary argument is merely speculative, depends on fee structures no one seeks, and service reductions that NRECA has not proposed. Defendants' Br. 51-55; *see supra* 47-49. Neither possibility places Mullins and Sunderlin at odds with the class in pursuing the certified claims or makes the district court's determination unreasonable.

This Court rejected the same kind of speculative conflict in *Ward*. There, the defendants argued that Ward would likely recover enough to offset any premium

increase resulting from the lawsuit, while class members with smaller damage awards might not. *Ward*, 595 F.3d at 179-80. The Court explained that "the conflict rests on the ***uncertain prediction*** that this lawsuit will cause premiums to increase enough to adversely affect some members of the class." *Id.* at 180 (emphasis added). Gissiner's prediction that a judgment might cause NRECA to reduce services is similarly uncertain. It does not place Mullins and Sunderlin at odds with any class member in establishing Defendants' liability or recovering the Plan's losses. *Ward* therefore supports the district court's determination.

Although this Court's review in *Gunnells* was "particularly deferential" because it involved an interlocutory appeal from a conditional class certification order, its adequacy analysis remains instructive. 348 F.3d at 424. There, the plan administrator argued that employer and employee class members had conflicting interests because the employees might sue their employers for unpaid medical bills. *Id.* at 430. This Court rejected the asserted conflict because "no employee has filed such a claim" and, even if an employee could bring one, the two groups shared common objectives and the same interest in establishing the administrator's liability. *Id.* at 430-31.

The same reasoning supports the district court's determination here. Defendants contend that Mullins and Sunderlin conflict with higher-balance participants who might prefer fixed-dollar fees. Defendants' Br. 51-53. However,

Defendants identify no higher-balance participant challenging the Plan's asset-based allocation method in favor of fixed dollar fees and no cooperative seeking tiered pricing. In any event, Plaintiffs do not seek either alternative. And any hypothetical preference for those alternatives would not alter the Class's shared interest in establishing whether Defendants caused the Plan to pay excessive administrative fees. Mullins and Sunderlin are therefore not at odds with the class.

Defendants' authorities are unpersuasive because they both involved actual conflicts. In *Sharp Farms v. Speaks*, this Court reversed certification of a settlement class because there were two competing classes and the settlement would distribute reserve funds to members who had not contributed to them while extinguishing the separate claims of members with traceable interests in those funds. 917 F.3d 276, 281, 295-98 (4th Cir. 2019). Here, no subgroup asserts a separate legal entitlement to any recovery or a competing claim that this litigation would extinguish. Mullins and Sunderlin seek only to establish that Defendants caused the Plan to pay excessive administrative fees and to restore any resulting Plan loss for proportional allocation among ***all*** class members.

*Broussard* likewise involved an actual conflict over the appropriate remedy. Franchisees who had signed releases could not benefit from a damages award, and a group of them sought restitution to an advertising account instead. *Broussard*, 155 F.3d at 338. The named plaintiffs repeatedly disavowed restitution, and some

released franchisees sought to intervene because they believed a large damages award would imperil their continuing relationship with Meineke. *Id.* at 338-40. The named plaintiffs thus pursued a remedy that benefited them while abandoning the only remedy available to the released franchisees.

That did not happen here. Plaintiffs never asserted a claim that NRECA was required to adopt a fixed per-participant fee structure. Although Donaldson discussed the advantages of fixed fees, he identified NRECA's failure to analyze alternative fee methodologies, including a fixed-dollar approach, as imprudent. JA865-866. Plaintiffs made that distinction in their initial certification reply. JA1236. Clarifying the scope of Donaldson's opinion did not abandon a remedy sought by higher-balance participants. Any restored Plan loss would be allocated proportionally among affected participants, including those with higher balances. Because Defendants' asserted divergence depends on a remedy no one seeks, the court did not abuse its discretion by deciding that Plaintiffs were adequate representatives.

## IV. Plaintiffs Established Article III Standing

Article III inquiry begins with an analysis of the nature and character of the plaintiffs' claims. *Peters v. Aetna Inc.*, 2 F.4th 199, 214-15, 217 (4th Cir. 2021). Where, as here, Plaintiffs bring claims arising from Plan-wide losses caused by

fiduciary misconduct, restitution and disgorgement are appropriate remedies for the corresponding injuries. *Id.*

Under a restitution theory, Plaintiffs need only show a concrete financial injury, which *Peters* confirms occurs when plan participants paid more than they should have as a result of a breach of fiduciary duty. *Id.* at 218-19. Under a disgorgement theory, Plaintiffs need to "enumerat[e] the fiduciary duties she contends were owed to her and the plan and [the fiduciaries'] subsequent violation of those duties." *Id.* at 220-21. Respondents submitted substantial evidence supporting both theories.

Plaintiffs suffered concrete financial injuries because they bore portions of the excessive Plan-level fees challenged here. Using Defendants' records, Gissiner calculated the fees charged to their accounts. JA1088-1089, JA1210-1211; *see also supra* 5-12 (explaining how common evidence establishes how participant-level charges arose). Plaintiffs also presented Donaldson's fiduciary process opinion, Scheinberg's market analysis, and [redacted]. *See supra* 8-11. That evidence refutes Defendants' assertion that Scheinberg supplied the "sole evidence" of injury. Defendants' Br. 59.

Taken together, the evidence shows that Defendants' challenged fiduciary process caused the Plan to pay excessive administrative fees, which in turn increased

the amounts charged to Mullins's and Sunderlin's accounts. Restoring any resulting Plan loss for proportional allocation among affected participants would remedy those injuries.

*Peters* confirms that the relevant standing question is whether the challenged conduct caused Mullins and Sunderlin to pay more than they otherwise would have paid. There, the defendants argued that the plaintiff suffered no financial injury because benefits she received on other claims offset the amounts she overpaid on the challenged claims. *Peters*, 2 F.4th at 218-19. For standing purposes, this Court rejected that aggregate comparison and held that the bundled rate "caused her to pay more on certain individual claims than she otherwise would have had to pay under the Plan's terms." *Id.* at 219. Applied here, that inquiry compares the amounts charged to Mullins's and Sunderlin's accounts with the amounts they would have been charged had the Plan paid reasonable administrative fees.

Defendants instead treat Scheinberg's comparator median as an individual injury threshold, arguing that Mullins and Sunderlin were not injured whenever their annual charges fell below it. But that is not how Scheinberg used the median. Scheinberg used the comparator median to estimate the reasonable cost of administering the Plan and the amount by which the Plan's actual administrative fees

exceeded that cost. JA800-801.[11] Because the Plan allocated its administrative fees among participants, a participant's charge could fall below the median and still include a portion of that excess.

Plaintiffs also established an independent basis for standing to seek disgorgement. *Peters* holds that a participant whose legally protected interest is harmed by a fiduciary breach "need not demonstrate a personal financial loss to establish standing to request disgorgement of improper gains." 2 F.4th at 220. As detailed above, the Plan paid NRECA for administrative services, and Plaintiffs presented evidence that the Plan's administrative expenses exceeded market levels. *See supra* 6-7, 10-11. Plaintiffs also contend that the Committee permitted NRECA to receive unreasonable compensation from Plan assets through transactions prohibited by ERISA. JA75-76, JA83-91. That alleged breach harmed Mullins's and Sunderlin's legally protected interests as Plan participants and conferred an improper gain on NRECA, thus establishing their standing to seek disgorgement.

---

[11] Defendants' arguments concerning purportedly hidden fees and revenue sharing challenge the validity of Scheinberg's comparators; they do not establish that Appellees suffered no injury. In any event, Appellees rebutted those arguments by demonstrating that Plaintiffs and Plan participants paid more than they would have under a prudent fiduciary process. *See* JA1225-1231, JA1234-1238, JA1357-1358. Defendants' depiction of NRECA as providing a high level of services [redacted]. JA853-859, JA921-923, JA938-941, JA943-944, JA367-411, JA435-441, JA250-251. Defendants also offer no evidence that the purported service differences rendered NRECA's above-market fees reasonable or eliminated the resulting injury.

*Thole* does not compel a different result.[12] The defined-benefit participants there had received all their monthly benefits and would receive the same monthly payments for the rest of their lives regardless of the plan's value. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 542-44 (2020). Because they had suffered no personal injury, they could not establish Article III standing merely by invoking § 502(a)(2). *Id.* 542-44, 546. Here, by contrast, Plaintiffs paid portions of the allegedly excessive fees, as explained above. Their standing rests on that financial injury, not § 502(a)(2) alone.

Defendants' remaining authorities involved plaintiffs who failed to establish a concrete personal injury. *See Freeman v. Progressive Direct Insurance Co.*, 149 F.4th 461, 467 (4th Cir. 2025); *Dreher v. Experian Information Solutions, Inc.*, 856 F.3d 337, 343-47 (4th Cir. 2017); *Beck v. McDonald*, 848 F.3d 262, 270, 273-77 (4th Cir. 2017). Plaintiffs established that injury here.

---

[12] Defendants read too much into the district court's statement that Plaintiffs had "adequately alleged Article III standing under § 502(a)(2)." Defendants' Br. 58, 60. The court made that determination after extensive briefing, evidentiary submissions, and argument concerning the fees charged to Plaintiffs. *See supra* 11-12. Nothing in that statement indicates that the district court disregarded those personal financial injuries and relied solely on injury to the Plan. In any event, *Peters* confirms that a participant's suit on behalf of a plan under § 502(a)(2) "does not alter" the standing analysis once the participant has established a personal injury. 2 F.4th at 221.

## CONCLUSION

For the foregoing reasons, the Court should affirm the class certification order. Alternatively, if this Court concludes that the district court should have more fully articulated the analysis it plainly undertook, it should remand for further explanation.

Date: September 10, 2026

*<u>/s/ Roland Tellis</u>*

Roland Tellis
David Fernandes
Sterling Cluff
Kelsey Elling
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436

Catherine Dorsey
**BARON & BUDD, P.C.**
2600 Virginia Avenue NW, Suite 900
Washington, D.C. 20037

*Counsel for Plaintiffs-Appellees*

## REQUEST FOR ORAL ARGUMENT

Plaintiffs request oral argument. This appeal raises issues not decided by *Trauernicht v. Genworth Financial, Inc.*, 169 F.4th 459 (4th Cir. 2026), which addressed individualized investment-loss claims rather than a Rule 23(b)(3) class challenging administrative fees set at the Plan level. Oral argument would aid the decisional process by allowing the parties to address the district court's analysis in its written and oral rulings and to determine whether any need for further explanation would warrant remand rather than denial of certification.

## CERTIFICATE OF COMPLIANCE

The brief complies with the type volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 12,957 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it appears in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 10, 2026

*/s/ Roland Tellis*
Roland Tellis
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, I caused the foregoing Response to be electronically filed with the Clerk of the Court for the United States of Appeals for the Fourth Circuit using the CM/ECF system and thereby served on all counsel of record.

Dated: September 10, 2026

*/s/ Roland Tellis*

Roland Tellis
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436

*Counsel for Plaintiffs-Appellees*